948 So.2d 635 (2006)
John TROY, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. SC04-332.
Supreme Court of Florida.
October 19, 2006.
*638 James Marion Moorman, Public Defender and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant/Cross Appellee.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee/Cross Appellant.
PER CURIAM.
John Troy, appellant, appeals his conviction for armed burglary, armed robbery, sexual battery, and first-degree murder; and a sentence of death for the murder conviction. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we affirm the convictions and sentence.

FACTS AND PROCEDURAL HISTORY
John Troy was indicted for first-degree murder of Bonnie Carroll, as well as armed burglary and armed robbery; a fourth count, attempted sexual battery with a weapon upon Carroll, was later added by information. Troy was separately charged by information for the related armed burglary, aggravated battery, armed kidnapping, and armed robbery of Traci Burchette. Trial by jury resulted in guilty verdicts on all counts in both cases. Following a penalty phase, the jury recommended a death sentence for the murder by an eleven-to-one vote and the trial court imposed a death sentence.
The evidence presented at trial indicated that on September 12, 2001, at approximately 5:30 p.m., the nude and dead body of Bonnie Carroll, twenty, was found in her home in the Timberchase Apartments in Sarasota. Debbie Ortiz, Carroll's mother, discovered her daughter's body. Ortiz had last seen Carroll alive at approximately 11:15 p.m. on September 11, 2001, when Carroll left Ortiz's home with Carroll's two-year-old daughter Cynthia.
*639 Associate medical examiner Dr. Michael Hunter arrived on the scene of the homicide at 2:05 a.m. on September 13. A knife was discovered in close vicinity to Carroll's body, and an electrical cord was found tied around her thigh. Dr. Hunter determined that Carroll was murdered around midnight on September 12. Dr. Hunter also observed a cloth tied around the victim's neck, numerous stab wounds to the front of the body, large incised wounds to the neck area, and blunt force impact injuries around the face. During the autopsy, Dr. Hunter found a piece of cloth inside Carroll's mouth that had been folded over and wedged firmly in the back of her throat. Blood on the fabric indicated that she was alive when it was inserted. The autopsy also revealed another cloth loosely tied around Carroll's neck and petechial hemorrhages in the eyespossibly but not conclusively indicating strangulation. Carroll suffered multiple areas of blunt impact injuries to her face, chin, and scalp, including small fresh injuries to the external genitalia and thighs. There were two very small areas of vascular dilation on her external genitalia, but no internal injuries to that area. No semen was identified, but at trial Dr. Hunter noted that all the factors were consistent with someone attempting to sexually batter the victim before she was killed. Carroll's body had suffered a total of fifty-four injuries, including forty-four stab wounds, three areas of incise wounds to the neck, at least seven impact injuries to the face, and multiple defense wounds on the hands.
A knife blade was also broken off within Carroll's body, which Dr. Hunter became aware of via x-ray. A bladeless knife handle was recovered from the counter of Carroll's bathroom. It contained the blood of both Troy and Carroll. Heather Velez, a crime lab microanalyst with the Florida Department of Law Enforcement (FDLE), testified that the bladeless knife handle and the knife blade had at one time been a single piece. Carroll's blood was also found on a steak knife, indicating that two weapons were associated with her injuries. There was no evidence of drugs in her system, and her blood alcohol level of 0.037 was consistent with having had a glass of wine.
John Troy also resided at Timberchase Apartments with his mother, Debra Troy, his girlfriend Marilyn Brooks, and Brooks' daughter. Troy was released from prison on July 25, 2001, approximately five weeks before the murder, after serving a sentence for armed robbery. Upon his release, Troy was placed on two years' probation. His conditional release mandated that he submit to regularly scheduled drug testing; Troy admitted to his probation officer that he would be unable to pass his first scheduled drug test because he had smoked marijuana while incarcerated. The drug test was then rescheduled for September 11, 2001, and on that date, Troy tested positive for cocaine and was informed by his probation officer that he would soon be reincarcerated for violation of probation.
When he returned to his residence after his failed drug test, Troy got into a series of arguments with Brooks before leaving his apartment to visit Melanie Kozak's residence, where he used cocaine. Brooks testified that Troy took a kitchen knife with him and did not return. On September 11 and 12, Troy made a total of four visits to see Kozakthree before the murder and one after. During each visit, Troy and Kozak ingested cocaine together.
Troy was also involved in an incident with his downstairs neighbor, Karen Curry, on the evening of Carroll's murder. At approximately 12:30 a.m. on September 12, Troy pounded on her rear sliding glass door. She told him to go away, and called *640 the police. Officer Derek Gilbert responded to Curry's call. Officer Gilbert went to the Troy apartment to investigate, but Troy was not home.
Carroll's death occurred some time between Troy's encounter with Curry and a 2 a.m. visit with Kozak. After Carroll's death, Troy stopped by Kozak's house, ingested some cocaine, then drove around in Carroll's car and decided to visit Traci Burchette, a psychiatric nurse and friend of Troy's mother.[1] Troy parked a couple of streets away from Burchette's house, and then went into her backyard and picked up a two-by-four board. Concealing the board, Troy knocked on Burchette's front door at approximately 6:30 a.m. When she awoke and came to the door, Troy said that his car had broken down and he needed to use her telephone. She invited him in and Troy pretended to call a friend for a ride. Burchette stated that he appeared perfectly normal. She made him coffee, and Troy asked to use her computer. When Burchette leaned down to turn the computer on, she was attacked by Troy from behind. In the attack, Burchette lost fingernails on both hands and broke her knuckles while suffering a skull fracture. Troy bound and gagged her, took her car keys and her ATM card, and left.
Bank records indicated that Troy attempted to use Burchette's ATM card at a Sun Trust Bank in Arcadia at 8:24 a.m. Troy then headed south on Interstate 75 towards Naples. Meanwhile, Burchette managed to call 911; police arrived and she gave a description of Troy and her car. Troy was stopped in Naples by local police mid-afternoon on September 12 in Burchette's car with a female passenger. Police questioned the passenger and located the two-by-four board used in Burchette's attack along the highway near Ft. Myers. DNA testing later revealed Burchette's blood on the two-by-four.
At the time of his arrest, Troy was wearing a pair of tennis shoes, blue jeans, a T-shirt, and a baseball cap. Pursuant to trial stipulations regarding DNA evidence, the shoes contained Carroll's blood, the blue jeans contained both Carroll and Burchette's blood, and the T-shirt tested positive for Burchette's blood. Also, material removed from Carroll's fingernails disclosed a mixture of Troy's DNA. Two pieces of broken glass were recovered from Carroll's bedroom and tested for DNA. One piece, containing her blood, was found lying on her bra. The other piece of glass, which tested positive for Troy's blood, was found lying to the left of Carroll's body. Latent print examiner Jackie Scogin identified a match of Troy's fingerprint on a glass found on Carroll's kitchen counter.
At the outset of trial, with Troy's consent, defense counsel acknowledged in his opening statement both that Troy killed Carroll and that he had attacked Burchette. However, he claimed Troy was only guilty of second-degree murder on the basis that the killing was neither premeditated nor committed during the perpetration of any felony. Although Troy did not contest most of the charges, the defense, in its case and on cross-examinations, introduced physical evidence, photographs, and testimony to corroborate Troy's statements. Specifically, the defense substantiated that Troy was in Carroll's apartment by invitation, that the two of them were socializing prior to their argument which culminated in her murder, and that Troy used drugs while in her apartment. There was no evidence of forced entry into Carroll's apartment. Despite the defense *641 claims, Troy was found guilty of first-degree murder and all other charges.
In the penalty phase of the trial, the State introduced evidence of Troy's four prior felony convictions, including three armed robbery convictions and one conviction for aggravated assault with a weapon, his four contemporaneous convictions resulting from the Burchette battery, his conditional release status in both Florida and Tennessee, and three victim impact statements.
The defense's penalty phase presentation focused on Troy's upbringing, his behavior and adjustment in prison, his potential for rehabilitation if sentenced to life imprisonment, and the impact of the tragic national events of September 11, 2001, which the defense claimed resulted in Troy's explosion of violence. In addition to the numerous family members and other character witnesses who testified on Troy's behalf, Dr. Michael Maher, a clinical and forensic psychiatrist, also gave expert testimony concerning the effects of Troy's difficult upbringing. He testified regarding (1) Troy's unstable, physically and emotionally abusive childhood; (2) Troy's being sexually molested at age thirteen by an adult male teacher, which resulted in humiliation and ostracism after Troy was the key witness at the teacher's high-publicity trial in a small town; (3) Troy's arrested psychological development; (4) Troy's lifelong depressive illness; (5) Troy's chronic drug addiction from an early age; (6) Troy's response to the national events of September 11; and (7) Troy's acute intoxication at the time of Carroll's murder.
At the Spencer[2] hearing, held on November 21, 2003, defense counsel called Detective Gradoski of the City of Sarasota. Defense counsel asked Gradoski, who took a previously suppressed statement from Troy the day after the murder,[3] two questions: (1) Whether Troy had accepted responsibility for the death of Carroll, and (2) whether Troy had expressed remorse for his crimes. Gradoski answered both questions in the affirmative. Thereafter, the State argued that, by defense counsel questioning Gradoski about some aspects of the suppressed confession, the State should be allowed to inquire about the entire confession despite its prior suppression. The trial judge agreed.
Troy's statement to Gradoski indicated that he tied the victim with an extension cord and that he knew Carroll would call the police if he let her go. Troy said that he and Carroll began fighting in the living room, but wrestled their way back to the bedroom, and that Carroll was talking loudly, and he shoved something into her mouth to quiet her. They wrestled on the bed, and he then cut electrical cords to tie her hands and feet. Troy asked Carroll if she wanted to have sexual relations, and she replied affirmatively. Carroll then got her hands free and the two began fighting, and Troy began stabbing her with a knife and with broken glass. Troy also stated that he had brought one of the knives he used, and that he took the other from her kitchen. After thinking he had killed Carroll, Troy went into the kitchen to get her *642 money and keys out of her purse; he then heard movement in the bedroom and returned to find her still alive and trying to sit up, at which point he cut her throat. Troy denied having sexual intercourse with Carroll, but admitted that he took her into the bathroom to "clean her up" before sex, and he indicated that the two were going to have sex. Troy admitted that he tied her hands and feet, and that he had to cut her clothing off because she was tied up and unable to remove it. While Troy stated he realized he would have to "eliminate" Carroll as a witness, he denied any type of sexual battery.
Detective Gradoski also testified that Troy told the officers he had taken heroin, cocaine, powdered cocaine and Paxil on the night of the crimes. Troy said the argument with Carroll began when she made disparaging remarks about Marilyn Brooks. He also stated he used cocaine while in Carroll's apartment. He thought the Paxil influenced his actions on the night of the crimes. Gradoski reiterated that Troy expressed remorse, saying he felt repulsed by what he had done. Finally, Gradoski testified that Troy was not crying, ill, or vomiting, and was able to calmly explain what had occurred. At the close of the Spencer hearing, Troy offered two allocutions of remorse, one for Tracie Burchette and one for the trial court. He had prepared one for the family of Bonnie Carroll, but they requested that he not offer it.
The trial court imposed a death sentence and found four aggravating factors: (1) The capital felony was especially heinous, atrocious, or cruel (HAC) (great weight); (2) Troy was previously convicted of a capital felony or a felony involving the use of or threat of violence (considerable weight); (3) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation (considerable weight); and (4) the capital felony was committed during the commission or attempt to commit a robbery or sexual battery (considerable weight).[4]
In mitigation, the trial court found both of the statutory mental mitigating circumstances, according great weight to impaired capacity and moderate weight to extreme mental or emotional disturbance. The trial court also found fifteen nonstatutory mitigating factorsall of which received little weight. These mitigating factors included: (1) Troy's dysfunctional family background; (2) Troy's positive personal characteristics and actions, including protecting a Tennessee correctional officer during a prison incident; (3) Troy's being sexually molested; (4) Troy's "triple addiction" to alcohol, cocaine, and marijuana; (5) Troy's lifelong history of mental and emotional problems; (6) Troy's potential for positive contributions if sentenced to life imprisonment; and (7) Troy's expressions of remorse.

ISSUES ON APPEAL
Troy raises eight issues on appeal: (1) Section 775.051, Florida Statutes (2001), excluding voluntary intoxication as a defense, is unconstitutional; (2) the evidence is legally insufficient to prove attempted sexual battery; (3) the trial court erred in denying Troy's right of allocution before the jury, and in allowing the State to introduce Troy's suppressed confession at the Spencer hearing; (4) the trial court erred in excluding Michael Galemore's testimony; (5) the trial court erred in failing to instruct the jury on the age mitigator; (6) *643 the trial court erred in instructing the jury that the law requires the death penalty in this case; and (7) Florida's death penalty scheme is unconstitutional.[5] Finally, although not raised by Troy, we have reviewed the record and conclude that, in light of the totality of the circumstances, the evidence to sustain a conviction of first-degree murder is sufficient and Troy's death sentence is proportionate when compared to the facts of other death penalty cases.

1. Constitutionality of Section 755.051
Troy first argues that section 775.051, which prevented him from asserting a defense of voluntary intoxication, is constitutionally invalid because it operates as an evidentiary proscription rather than a redefinition of mens rea. Troy asserts that, while the United States Supreme Court upheld a similar statute in Montana v. Egelhoff, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), there are significant differences between the statute in that case and Florida's statute.[6]
Whether challenged statutes are constitutional is a question of law which the appellate court reviews de novo. Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So.2d 492, 500 (Fla.2003). Section 775.051 provides as follows:
775.051. Voluntary intoxication; not a defense; evidence not admissible for certain purposes; exception. Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense, except when the consumption, injection, or use of a controlled substance under chapter 893 was pursuant to a lawful prescription issued to the defendant by a practitioner as defined in s. 893.02.
§ 775.051, Fla. Stat. (2001). Section 775.051 was enacted in 1999, several years after the United States Supreme Court rendered its decision in Egelhoff. See ch. 99-174, § 1, Laws of Fla.
In Egelhoff, the Court found that Montana's statute providing that "voluntary intoxication `may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense,'" 518 U.S. at 39-40, 116 S.Ct. 2013, did not violate the due process clause. Id. at 56, 116 S.Ct. 2013. Writing for a plurality, Justice Scalia noted that the common law did not allow for a defense of voluntary intoxication for specific intent crimes, and that the defense was *644 created through judicially created exceptions to the common law rule. Id. at 45-46, 116 S.Ct. 2013. Justice Scalia emphasized that states have traditionally been given wide latitude in regulating the methods by which its laws are executed, and that the federal courts will only intervene under the Due Process Clause if the state rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id. at 43, 116 S.Ct. 2013 (quoting Patterson v. New York, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). The opinion concluded that the defense did not constitute a fundamental principle of justice, and that nothing in the due process clause prevents "[t]he people of Montana [from deciding] to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue." Id. at 56, 116 S.Ct. 2013. Thus, the defendant must establish that his "right to have a jury consider evidence of his voluntary intoxication in determining whether he possesses the requisite mental state is a `fundamental principle of justice.'" Id. at 43, 116 S.Ct. 2013.
In Florida, two appellate decisions have addressed and upheld the constitutionality of section 775.051. See Barrett v. State, 862 So.2d 44 (Fla. 2d DCA 2003); Cuc v. State, 834 So.2d 378 (Fla. 4th DCA 2003). In Cuc, the defendant alleged that she was denied her right to due process of law under section 775.051 because she was not allowed to raise a defense of voluntary intoxication. 834 So.2d at 378. In affirming her conviction, the Fourth District noted that the statute at issue in Florida was similar to the one upheld in Egelhoff. Id. Thus, in affirming her conviction, the court concluded that "[a]s in Egelhoff, the people of the State of Florida have decided to resurrect the rule that intoxication is not a defense to specific intent crimes." Id. at 379 (citing § 755.051, Fla. Stat. (2000)).
In the case before the Second District, Barrett was convicted of first-degree murder; on appeal, he argued that section 775.051 "improperly excludes a class of relevant evidence and lessens the State's burden to prove his guilt beyond a reasonable doubt." Barrett, 862 So.2d at 45. Barrett conceded that the Florida statute was similar to the statute upheld in Egelhoff, but he argued that Florida's Constitution provides stronger due process protections than does the United States Constitution. Id. at 47, 116 S.Ct. 2013. The Second District disagreed, holding that "there is no basis to conclude that the Florida Constitution provides greater protections to Barrett than does the United States Constitution in relation to the elimination of voluntary intoxication as a defense to a criminal offense." Id. at 48, 116 S.Ct. 2013.
The Barrett court also considered whether section 775.051 effects a "substantive change to the mens rea element of criminal conduct or is simply a rule of evidence." Id. at 48. The court found that, based on this Court's precedent in State v. Garcia, 229 So.2d 236, 238 (Fla. 1969), and Caple v. Tuttle's Design-Build, Inc., 753 So.2d 49, 53 (Fla.2000), the change is substantive, in line with Egelhoff:
Substantively, section 775.051 addresses the mens rea element of criminal offenses by stating that voluntary intoxication is not a defense to criminal conduct and cannot be used to show that the defendant lacked the specific intent to commit a crime. This is consistent with the State's interest in making persons who voluntarily become intoxicated responsible for their behavior. See Egelhoff, 518 U.S. at 49-50. However, the statute also addresses procedural *645 matters by excluding, at trial, evidence of voluntary intoxication.
Although section 775.051 has both substantive and procedural elements, this does not render the statute constitutionally infirm when the procedural provisions "are intimately related to the definition of those substantive rights." See Caple, 753 So.2d at 54. As was the case with the Montana statute under Justice Ginsburg's analysis, section 775.051 effects a substantive change in the definition of mens rea, and it is not simply an evidentiary rule. See Egelhoff, 518 U.S. at 57-60.
Barrett, 862 So.2d at 48 (parallel citations omitted). We find the reasoning and conclusions in Cuc and Barrett to be sound and we adopt that reasoning as our own.
Troy further asserts that section 775.051 violates equal protection principles and creates an unconstitutional distinction based on whether or not the charged individual was using an intoxicating substance in accordance with a lawful prescription. In Duncan v. Moore, 754 So.2d 708 (Fla. 2000), we held:
Equal protection is not violated merely because some persons are treated differently than other persons. It only requires that persons similarly situated be treated similarly. In the absence of a fundamental right or a protected class, equal protection demands only that a distinction which results in unequal treatment bear some rational relationship to a legitimate state purpose. This is known as the rational basis test. Since there is no fundamental right or suspect class at issue here, the State need only meet that test.
Id. at 712 (citations omitted). In applying the rational basis test, the courts first look to whether the statute serves a legitimate government purpose, and second, whether the legislature was reasonable in its belief that the classification would promote that purpose. Hechtman v. Nations Title Ins. of New York, 840 So.2d 993, 996 (Fla.2003).
Both prongs are easily satisfied in this instance. The exception in the statute protecting prescription drug users is derived from the Fourth District's decision in Brancaccio v. State, 698 So.2d 597 (Fla. 4th DCA 1997); in that decision, the court rationalized as follows:
Because a patient is entitled to assume that an intoxicating dose would not be prescribed or administered by a physician, where intoxication results from medicine which has been prescribed (and taken as prescribed) or administered by a physician, such intoxication is generally considered involuntary.
698 So.2d at 599 (quoting Phillip E. Hassman, Annotation, When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge, 73 A.L.R.3d 195 (1976)). We find it reasonable for the Legislature to conclude that penal accountability should not attach to the lawful use of prescribed drugs where an unfortunate reaction has occurred, and we reject both Troy's due process challenge and his equal protection challenge to section 775.051.

2. Sexual Battery Conviction
Troy next argues that the State failed to present evidence inconsistent with the reasonable hypothesis that no attempted sexual battery occurred, and thus that the circumstantial evidence is legally insufficient to prove the charge of attempted sexual battery.
In Johnston v. State, 863 So.2d 271 (Fla. 2003), this Court explained the applicable law governing sufficiency of circumstantial evidence in upholding convictions:
In reviewing a motion for judgment of acquittal, a de novo standard of review applies. See Pagan v. State, 830 So.2d *646 792, 803 (Fla.2002), cert. denied, 539 U.S. 919 (2003). Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. See Pagan, 830 So.2d at 803 (citing Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996)). There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. See Banks v. State, 732 So.2d 1065 (Fla.1999). "A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Orme v. State, 677 So.2d 258, 262 (Fla.1996).
"The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse." Darling v. State, 808 So.2d 145, 155 (Fla.) (quoting State v. Law, 559 So.2d 187, 188 (Fla. 1989)), cert. denied, 537 U.S. 848 (2002). In meeting its burden, the State is not required to "rebut conclusively, every possible variation of events" which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events. Darling, 808 So.2d at 156 (quoting Law, 559 So.2d at 189). Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt. Id.

. . . .
This Court does not have to determine that every reasonable hypothesis of innocence was excluded in this case. The sole determination we must make is whether there was competent, substantial evidence for the jury to make such a determination. See Darling, 808 So.2d at 156 (citing Law, 559 So.2d at 188-89).
Johnston, 863 So.2d at 283-84 (parallel citations omitted).
Troy contends that the circumstantial evidence produced by the prosecution just as easily establishes that he attacked Carroll in a frenzied rage, resulting in the torn clothing and the minor bruising on the thigh areas. Thus, he argues, this is a reasonable hypothesis of innocence to the charge of attempted sexual battery that the State has failed to exclude. The State counters that there is both direct evidence establishing Troy's presence at the scene of the attempted sexual battery and an overwhelming wealth of circumstantial evidence establishing that an attempted sexual battery occurred.
First, we agree with Troy in his assertion that the trial judge misconstrued the medical examiner's findings when denying the defendant's motion for judgment of acquittal on the sexual battery charge, both as an independent charge and as a basis for felony murder.
While the trial court stated that the medical examiner had rendered a definitive opinion on attempted sexual battery, a thorough review of the medical examiner's testimony reveals only his statement that Carroll's injuries were consistent with an attempted sexual battery, but were not conclusive.[7]
*647 However, this Court has held that "[i]f there is room for a difference of opinion between reasonable people as to the proof or facts from which an ultimate fact is to be established, or where there is room for such differences on the inferences to be drawn from conceded facts, the court should submit the case to the jury." Barwick v. State, 660 So.2d 685, 695 (Fla.1995) (quoting Taylor v. State, 583 So.2d 323, 328 (Fla.1991)). Among the indicia of an attempted sexual battery produced at trial is the evidence that the victim was found completely nude, with her underwear and torn bra next to her body, and that she exhibited bruises in the exterior of her vaginal area. When coupled with the extensive evidence presented of the gruesome nature of the crime scene reflecting a great deal of violence inflicted upon the victim, we conclude that the trial court was correct in submitting this charge to the jury, despite the trial court's mischaracterization of the medical examiner's testimony. Importantly, despite the trial judge's overstatement of the conclusive nature of the medical examiner's testimony, this expert nevertheless found that Ms. Carroll's injuries could support the conclusion that an attempted sexual battery occurred.

3. Fair Penalty Phase
Troy's third argument asserts that he was denied due process of the law when (1) he was prevented from exercising his right of allocution directly before the jury during his sentencing phase, and (2) the threat of cross-examination put Troy in a position where he could not risk exercising his constitutional right to testify or introduce other evidence regarding statements of remorse he made to law enforcement officers.

a. Right of Allocution
Prior to trial, Troy filed a motion to enforce his right to allocute in front of the jury, based on both constitutional and common-law *648 principles allowing a defendant to stand before the sentencing authority and present an unsworn statement in mitigation. Defense counsel relied heavily on State v. Zola, 112 N.J. 384, 548 A.2d 1022 (1988), a New Jersey Supreme Court decision providing for a capital defendant's right to make an unsworn statement in mitigation at the close of the penalty phase. However, as the State pointed out during the hearing on the motion, New Jersey is not an advisory state, and the jury actually undertakes sentencing in capital cases. The State also noted that in Florida, capital defendants have sufficient opportunity to allocute before the judge at a Spencer hearing. Finally, the State asserted that, should Troy make a statement to the jury, it would be essential to have the opportunity to cross-examine him regarding his suppressed confession, wherein Troy admitted to "slicing Bonnie Carroll's throat specifically to eliminate her as a witness," which obviously could be used as an aggravator. The trial court denied Troy's motion. Troy subsequently filed a mitigation proffer, in which he expressed his intent to address the jury to express his feelings of shame and remorse, but felt he was unable to do so without "opening the door" to allow cross-examination on his inadmissible confession.
We find no error in the trial court's order denying Troy the right to make a statement to the jury without the State having the right to cross-examine Troy. We also note that Troy did exercise his right to allocution before the trial court at his Spencer hearing. Spencer outlines the proper sentencing phase procedure to be followed in death cases; it also emphasizes the role of the circuit judge over the trial jury in the decision to impose a sentence of death:
First, the trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person. Second, after hearing the evidence and argument, the trial judge should then recess the proceeding to consider the appropriate sentence. If the judge determines that the death sentence should be imposed, then, in accordance with section 921.141, Florida Statutes (1983), the judge must set forth in writing the reasons for imposing the death sentence. Third, the trial judge should set a hearing to impose the sentence and contemporaneously file the sentencing order. Such a process was clearly not followed during these proceedings.

It is the circuit judge who has the principal responsibility for determining whether a death sentence should be imposed. Capital proceedings are sensitive and emotional proceedings in which the trial judge plays an extremely critical role.
615 So.2d at 690-91 (emphasis added). It is clear that this course of action was followed in the instant case, with Troy exercising his right to be heard in person before the judge prior to the imposition of the death penalty.
In Johnson v. State, 608 So.2d 4 (Fla. 1992), this Court rejected the defendant's claim that a videotape he made expressing remorse should have been shown to the jury. Id. at 10. At trial, the trial judge denied this request, agreeing with the prosecution that it would enable the defendant to escape cross-examination by not testifying in person. Id. This Court agreed with the trial court's decision to exclude the videotape, concluding,

*649 "All witnesses are subject to cross-examination for the purpose of discrediting them by showing bias, prejudice or interest." Jones v. State, 385 So.2d 132, 133 (Fla. 4th DCA 1980). Johnson could have made this plea to the judge, the sentencer, and we find no error in refusing to let the jury hear his self-serving statement.
Johnson, 608 So.2d at 10. We reaffirm our holding in Johnson here.

b. Troy's Ability to Testify and Introduce Evidence Regarding His Remorse
Prior to trial, the court determined that Troy's confession was acquired in violation of his right to counsel and would therefore only be admissible for purposes of impeachment. Troy argues that the prosecutor repeatedly made it clear every time he tried to introduce testimonial evidence of his remorse to the jury (either through his own testimony or through the testimony of Detective Gradoski), that she would, if permitted, seek to inquire about the suppressed confession, including statements therein possibly establishing the aggravator of witness elimination. The judge, in turn, repeatedly agreed that he saw no reason why the "door would not be open" regarding relevant information in the confession, and therefore Troy should proceed at his own risk. Thus, Troy asserts that the resulting constitutional Hobson's choice between his rights to testify and present evidence of the mitigating circumstance of remorse to the jury on the one hand, and his right not to be sentenced to death on the basis of a confession obtained in violation of his right to counsel on the other, deprived him of due process and a fair penalty hearing.
The record makes clear that any attempt on Troy's behalf to introduce evidence to the jury of his remorse could rightfully have been subject to a response by the State on credibility grounds. First, Detective Gradoski testified at the Spencer hearing that although Troy expressed his remorse for killing Carroll, he was calm and collected during his confession, coolly recounting the events from the night of the crimes. Furthermore, had Troy taken the stand himself, the State could have demonstrated that his statements to Gradoski contradicted those to his mother and his girlfriend, which were admitted during the guilt phase of the trial. Troy told both his girlfriend and his mother that Carroll "came onto" him and that he was not interested in having sexual relations with her; however, as came out during the Spencer hearing, Troy told Detective Gradoski that the two were planning to have sex. Troy also told his mother and girlfriend that he could not remember the episode with Carroll and that he blacked out; however, Troy was able to give Detective Gradoski a detailed description of the night's events and specific details of Carroll's murder.
As we noted in Johnson, if Troy desired to demonstrate his remorse to the jury and to make clear that he accepted responsibility for his actions, the fact-finder should be entitled to consider, though cross-examination, the exact version of events for which he is taking responsibility. Further, as this Court held in Butler v. State, 842 So.2d 817, 825 (Fla.2003), "we have often said that cross-examination is not limited to the exact details testified to on direct examination but extends to the whole subject and all matters that modify, supplement, contradict, rebut or make clearer the direct testimony." Id. (citing Chandler v. State, 702 So.2d 186 (Fla.1997); see also Geralds v. State, 674 So.2d 96 (Fla. 1996)). Thus, the trial judge was not in error in warning that any attempts to introduce evidence of remorse expressed during his confession might entitle the *650 State to inquire as to other portions of the statement (as did, in fact, occur during the Spencer hearing). Further, Troy has essentially presented this Court with a hypothetical situation of what might have happened but, because Troy chose not to take the risk and testify before the jury, did not actually occur. Accordingly, we conclude that the trial judge's actions did not constitute error.[8]

4. The Exclusion of Michael Galemore's Testimony
Troy's next claim involves the exclusion of the proffered testimony of Department of Corrections official Michael Galemore, an assistant warden at the Polk County Correctional Institution. He asserts that this exclusion violated the Eighth and Fourteenth Amendments because Galemore's testimony was relevant to the mitigating factor of Troy's potential for rehabilitation and positive contribution in a structured prison environment.
According to the trial records, defense counsel planned to call Galemore to testify that, hypothetically, were Troy sentenced to life imprisonment, it would be considered close custody, that Troy would be supervised in a particular fashion, and that he would work while in prison. Galemore was also to testify regarding the presence of drugs in prison, specifically that they are not easily obtained. The trial judge granted the State's motion to exclude him as a witness, emphasizing that Galemore had no personal knowledge of the defendant or the case.
The trial judge made clear that defense counsel still had the right to argue potential parole ineligibility to the jury as a mitigating factor, to present evidence as to whether Troy would pose a threat to prison personnel or other inmates, and to argue whether he was well-suited to imprisonment. Defense counsel made use of all of these options, presenting witnesses in mitigation regarding Troy's behavior in prison,[9] and arguing during closing that, if the jury chose life imprisonment, "John Troy will be in prison until the day he dies."
A trial court's ruling on the admission of evidence is reviewed by an appellate court under an abuse of discretion standard. Randolph v. State, 853 So.2d 1051, 1062 (Fla.2003) ("The admissibility of evidence lies in the sound discretion of the trial court and trial court decisions will be affirmed absent a showing of abuse of discretion.").
*651 We conclude that the trial court did not abuse its discretion in excluding Galemore's testimony. First, it should be noted that Galemore's testimony was offered during the penalty phase of Troy's trial, which lasted over four and a half days. Defense counsel called twenty-nine witnesses during this phase, indicating that the judge was not categorically excluding mitigation evidence or the presentation of defense witnesses. Furthermore, Galemore had never met Troy, nor had he ever witnessed Troy during one of his periods of incarceration, making his potential assessment regarding Troy's possible prison experience entirely speculative. When considered in context of the entire penalty phase, the other witnesses called, and the arguments defense counsel nevertheless made regarding a possible life sentence, the exclusion of Galemore as a witness was not an abuse of discretion.

5. The Age Mitigator
At trial, defense counsel asserted entitlement to the statutory age mitigator, arguing that a life sentence without the possibility of parole could be a more severe sentence due to the time Troy would serve, being only thirty-three at the time of his sentencing. Defense counsel went on to argue that "there was some testimony about the Defendant's emotional maturity that may be relevant to the consideration of that factor." The trial judge denied defense counsel's request.
Troy argues that the trial court erroneously denied his requested instruction to the jury on the statutory mitigating factor of age because the evidence established his emotional immaturity and arrested psychological development at the level of a teenager.
In his brief, Troy argues that during the penalty phase, psychologist Dr. Maher testified that the trauma from the sexual molestation and ensuing trial in Troy's teen years arrested his psychological and emotional development, and also that Troy has functioned throughout his life at an adolescent level. These claims are borne out by the record. However, we are not inclined to reverse the trial judge's decision on the age mitigator, given that we do not find a clear demonstration of abuse of discretion or harmful error.
In Nelson v. State, 850 So.2d 514 (Fla. 2003), this Court addressed the applicability of the statutory age mitigator if the defendant is over eighteen years of age. We summarized the applicable law as follows:
[W]here the defendant is not a minor, as in the instant case, "no per se rule exists which pinpoints a particular age as an automatic factor in mitigation." [Shellito v. State, 701 So.2d 837, 843 (Fla. 1997)]. The existence and weight to be given to this mitigator depends on the evidence presented at trial and the sentencing hearing. See id. For example, this Court has held that age twenty, in and of itself, does not require a finding of the age mitigator. See Garcia v. State, 492 So.2d 360, 367 (Fla.1986).
In Gudinas v. State, 693 So.2d 953 (Fla.1997), we held, "Although Gudinas is certainly correct that he had a troubling past and had always been small for his age, there was no evidence presented that he was unable to take responsibility for his acts and appreciate the consequences thereof at the time of the murders." Id. at 967. In that case, we found that there was substantial, competent evidence in the record to support the trial court's finding "that Gudinas was mentally and emotionally mature enough that his age should not be considered as a mitigator." Id.

Nelson, 850 So.2d at 528-29. In Nelson, this Court ultimately supported the trial court's rejection of the age mitigator, as *652 we found there was ample evidence establishing that Nelson functioned as a mature adult. Id. at 529 (finding that Nelson "obtained and temporarily held a job; he provided his child's mother with money to buy necessities when she was visiting; Nelson did not have a home of his own, but arranged to stay with [others]; and Nelson did not have a driver's license or a car, yet was able to travel places on his own. See Hurst v. State, 819 So.2d 689, 698 (Fla. 2002) (holding that the evidence did not support a finding that a non-minor suffered from mental and emotional problems sufficient to warrant age as a mitigator and noting that Hurst owned his own car, performed adequately in school, and helped with child care within his family")).
However, we have on occasion found error in a trial court's denial of the statutory age mitigator instruction. In Campbell v. State, 679 So.2d 720 (Fla.1996), this Court, remanding for resentencing on other grounds, held that the trial court erred in not giving a requested jury instruction on the age mitigator when the defendant was twenty-one years old at the time of his crime. Id. at 725-26. We held, "[E]vidence was presented showing Campbell's relatively young chronological age at the time of the crime . . . and linking this to the defendant's significant emotional immaturity. . . . In light of this evidence, the court should have given the requested instruction." Id. at 726.
Applying this case law to the instant facts, we find no clear abuse of discretion in the trial judge's decision to deny Troy's request. First, Troy was thirty-one at the time of his crimes, nearly thirteen years older than the legal age of majority. Furthermore, pursuant to Nelson, there is ample evidence that Troy functioned as a mature adult, including the fact that he was employed and cared for his girlfriend's daughter. Troy also failed to present any additional evidence regarding the applicability of the age mitigator before he was sentenced at his Spencer hearing. However, the record indicates that the judge did find and assign weight to various other mitigators that could have a bearing on Troy's emotional maturity, including the fact that the crime was committed while Troy was under extreme mental or emotional disturbance, that Troy's capacity to appreciate the criminality of his conduct was impaired, that his family background was dysfunctional, and that he had a long history of severe substance abuse and mental and emotional problems. All of these matters were also presented to the jury. In essence then, Troy was able to assert the substance of the claim he now makes, and thus was not deprived of the opportunity to assert his emotional immaturity. Given the unrestricted opportunity, Troy's counsel took full advantage and pursued the strategy of advancing Troy's emotional maturity as part of nonstatutory mitigation. We find no error by the trial court.

6. The Trial Court's Sentencing Order
Next, Troy asserts that the judge misapplied the law in his sentencing order by concluding that, based on the balance of aggravators to mitigators, Florida law required him to impose the death penalty. We find that this claim is not borne out by the record. The judge concluded the sentencing order as follows:
On balance the court has concluded the aggravating circumstances far outweigh the mitigating ones beyond and to the exclusion of any reasonable doubt, and that Florida law requires the death penalty to be imposed. In reaching this conclusion, the court has focused not on the quantity of aggravators or mitigators, but on their distinct qualities considering the totality of the circumstances. Terry v. State, 668 So.2d 954 *653 (Fla.1996); Floyd v. State, 569 So.2d 225[1225] (Fla.1990).
. . . .
Upon thorough reflection and examination, the statutory and non-statutory mitigating circumstances collectively and comparatively add little in the way of counterbalance. In light of the legal principles that apply in this case, the factors presented for mitigation are substantively inadequate to outbalance the aggravating circumstances. They do not approach equipoise.
The court has considered all aspects of defendant's character and record that might reasonably serve as a basis for imposing a sentence less than death. Campbell v. State, 571 So.2d 415, 419 (Fla.1990). When all the mitigating evidence is weighed together with the aggravating circumstances, the court has concluded that the aggravating ones substantially outbalance the mitigating ones. The jury recommendation is supported by the record beyond a reasonable doubt and must be respected.
Troy relies on Smith v. State, 866 So.2d 51 (Fla.2004), to argue that the trial judge incorrectly held that the law required the imposition of the death sentence, given that the aggravators outnumbered the mitigators.[10] In that case, the trial judge concluded that "the Legislature of this state has required that death must be imposed when the aggravating factors far outweigh the mitigating factors, and this Court must be guided by this law." Id. at 67. This Court remanded for resentencing, finding that this was an incorrect statement of the law. Id. In reaching this conclusion, we relied on Alvord v. State, 322 So.2d 533 (Fla.1975), where we held:
[Florida's death penalty] statute contemplates that the trial jury, the trial judge and this Court will exercise reasoned judgment as to what factual situations require the imposition of death and which factual situations can be satisfied by life imprisonment in light of the totality of the circumstances present in the evidence. Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment.
Alvord, 322 So.2d at 540. We conclude, however, that when considering the trial judge's sentencing order in its entirety, it does not run afoul of Alvord because the trial judge emphasized the totality of the circumstances in reaching his conclusion, not just the weight of the aggravators versus the mitigators.

7. Relief Pursuant to Ring v. Arizona, 536 U.S. 584 (2002)
Troy next argues that Florida's death penalty statute is unconstitutionally invalid because it does not require the findings of each aggravating factor to be made by the jury, pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has denied relief in appeals where the trial judge has found the "during the course of a felony" aggravator. See Robinson v. State, 865 So.2d 1259, 1265 (Fla.2004) ("This Court has held that the aggravators of murder committed `during the course of a felony' and prior violent felony involve facts that were already submitted to a jury during trial and, hence, are in compliance with Ring.") (citing Owen v. Crosby, 854 So.2d *654 182, 193 (Fla.2003)). Given that Troy was convicted of this crime simultaneously with two counts of armed burglary, two counts of armed robbery, and attempted sexual battery, relief on this Ring claim is denied.

8. Sufficiency of Evidence and Proportionality
Finally, although Troy does not challenge the sufficiency of the evidence or the proportionality of his death sentence, this Court must still consider those issues. See, e.g., Rimmer v. State, 825 So.2d 304, 331 (Fla.2002) ("Although appellant does not argue the proportionality of the death sentence in this case, this Court must nevertheless conduct a proportionality review."). We have outlined in detail the evidence presented at trial, and upon review, we find that evidence sufficient to sustain Troy's guilt of first-degree murder.
We also conclude that Troy's sentence of death is not disproportionate. Proportionality review "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a `thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases.'" Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990)).
The jury in this action recommended the death penalty by a vote of eleven to one. The trial court found four aggravating factors: (1) HAC (great weight), see § 921.141(5)(h), Fla. Stat. (2001); (2) Troy was previously convicted of another felony involving the use or threat of violence to the person (considerable weight), see § 921.141(5)(b), Fla. Stat. (2001); (3) Troy committed the capital felony while under a sentence of imprisonment or community control (considerable weight), see § 921.141(5)(a) Fla. Stat. (2001); and (4) Troy committed the murder while engaged in the commission of or an attempt to commit, or flight after committing or attempting to commit robbery and sexual battery (considerable weight), see § 921.141(5)(d), Fla. Stat. (2001).
In mitigation, the trial judge found that two statutory mitigating circumstances had been established: (1) The capital felony was committed while Troy was under the influence of extreme mental or emotional disturbance (moderate weight), see § 921.141(6)(b), Fla. Stat. (2001); and (2) Troy's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (considerable weight), see § 921.141(6)(f), Fla. Stat. (2001).
The trial judge considered the following nonstatutory mitigating factors: (1) Troy's dysfunctional family background (little weight); (2) Troy has many positive characteristics (little weight); (3) Troy was sexually molested as a teenager, testified in court, and was stigmatized in a small town (little weight); (4) Troy has a life-long history of severe substance abuse (little weight); (5) Troy has a life-long history of mental and emotional problems (little weight); (6) Troy adjusted well to the structured environment of prison, developed into an outstanding inmate, and behaved well in Sarasota County Jail and in the courtroom during the pendency of this case (little weight); (7) Troy cooperated with the police, fully confessed his guilt at the first opportunity, and offered to plead guilty on all charges (little weight); (8) Troy will remain incarcerated throughout the remainder of his life (little weight); (9) shortly before the offense, Troy had been released from incarceration after serving ten years, and experienced a difficult adjustment period (little weight); (10) Troy has three children, whom he cares for (little weight); (11) when arrested for *655 crimes in the past, Troy has cooperated with the police and confessed his guilt (little weight); (12) Troy is intelligent and he has obtained his GED (little weight); (13) Troy was previously confined longer than he should have been due to an illegal sentence (no weight); (14) Troy has shown some legal skills as demonstrated by his successful litigation of his illegal sentence (little weight); (15) Troy could assist corrections officers and other inmates if sentenced to life imprisonment (little weight); and (16) Troy has repeatedly expressed remorse for his conduct (little weight). The trial court found no evidence to support the following two nonstatutory mitigators: (1) Troy did not plan to commit the murder in advance, and that the murder was the result of a combination of circumstances unlikely to reoccur; and (2) as a youth, Troy huffed gasoline to the point of unconsciousness, and the lead in the gasoline may have affected his brain.
Upon review, we conclude that the circumstances of this case are similar to other cases in which this Court has upheld the death penalty. See Butler, 842 So.2d at 833 (holding the death sentence proportional for the first-degree murder conviction where only the HAC aggravator was found); Singleton v. State, 783 So.2d 970, 979 (Fla.2001) (holding the death sentence proportional for the first-degree murder conviction where the aggravators included prior violent felony conviction and HAC); Johnston, 863 So.2d at 278 (holding death sentence proportional for first-degree murder conviction where the court found two aggravating factors, one statutory mitigator, and twenty-six nonstatutory mitigators). Comparing the circumstances in this action to the cases cited above and other capital cases, we conclude that death is proportionate in this action.

CONCLUSION
For all of the reasons expressed above, we affirm the judgments and sentences, including the sentence of death, imposed by the trial court in this case.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, and CANTERO, JJ., concur.
BELL, J., recused.
NOTES
[1] Troy and his mother stayed at Burchette's house for a week in August 2001.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] Prior to trial, Troy moved to suppress his confession given to Detectives Gradoski and Wildtraut of the Sarasota Police Department on September 13, 2001. Troy argued that the confession was obtained in violation of his constitutional rights, since he was interrogated without being provided an attorney after he had invoked his rights. The trial judge ruled that the statements to the detectives were to be suppressed, available only for impeachment purposes if Troy decided to testify at trial.
[4] The trial court also found the pecuniary gain aggravator, but noted that it would be improper doubling to consider it with the robbery aggravator.
[5] The State also raises two issues on cross-appeal which we decline to review, since we are affirming the convictions and sentences.
[6] Troy filed a pretrial motion to declare section 775.051 unconstitutional as violative of the right to due process and another motion to declare the statute unconstitutional as violative of equal protection. In the first motion, Troy alleged that he would proffer evidence establishing that he ingested numerous drugs on the night that the crimes occurred, and, since such evidence would be relevant to the question of premeditation, section 775.051 unconstitutionally precluded him from presenting this relevant evidence in his own defense.

In the second motion alleging a denial of equal protection, Troy argued that the exception under the statute for lawfully prescribed drugs results in an equal protection violation because a person with a lawful prescription for a mood altering drug would be allowed to use voluntary intoxication as a defense, while a defendant who used the same drug without a prescription could not use the same defense.
[7] The following exchanges took place on direct examination of Dr. Michael Hunter, the medical examiner who examined Carroll's body:

Q. What other pieces of evidence or other things did you find that were consistent with a sexual battery having been attempted or completed?
A. Well, you know, once again, we don't work in a closed box of just having the victim as the autopsy. At the scene, this is an individual who is nude. This is an individual who we see evidence that she has some ligature which is present about one of her wrists, and "ligature" means that something has been present and tied and something restraining her wrist that leaves a particular pattern that I'm able to identify and interpret.
So I think all these changes, the fact that she's nude, she has evidence that she's been bound, she has injury, very minor injury but injury nevertheless on the external genitalia, and she had injuries of the legs, very small minor-type injuries, but I think those are all factors that I take in account in a case like this, saying, you know, those would be consistent with sexual assault.
. . . .
Q. In this particular case, given all the factors that you've talked about regarding the victim, the way she was found, the injuries that you found, in your medical opinion, are all these factors consistent with someone attempting to sexually batter this victim before she was killed?
A. I think it's consistent, yes.
During cross examination, Dr. Hunter confirmed that he did not consult with a gynecological expert in the case. The following exchange also took place:
Q. Isn't it true that hyperemias can be the result of certain gynecological conditions?
A. Yes.
Q. The areas of hyperemia that you observed, they were not abrasions or contusions, correct?
A. Right.
Q. They could have been from friction?
A. Yes.
Q. If there, in fact, was a tussle between Ms. Carroll and her attacker, these areas could be the result of the tussle?
A. Sure, yes.
Q. You are not telling the jury that what you observed, in fact, had to be a penetration injury from sexual assault?
A. Yeah, no, I'm not.
[8] It is important to note that in his final sentencing order, the judge relied only upon the statements of remorse and responsibility as expressed to Detective Gradoski in determining the final aggravators and mitigators. He concluded:

By using the police interview to prove mitigating evidence, the court ruled the defense had opened the door for the State to qualify, explain, limit or rebut the claim of remorse and to introduce evidence of additional aggravators using the same confession. See Ramirez v. State, 739 So.2d 568 (Fla.1999). However, while such a ruling appears to be an appropriate discretionary one under section 90.108(1) of the Florida Evidence Code, as well as under general concepts of evidentiary door opening, the legal precedent for it in a death penalty case is not clear.
Accordingly, in an admitted abundance of caution, and solely as a matter of law, the court has elected to deny the State any advantage from its use. The case for the death penalty in Mr. Troy's case will stand or fall on its own, independently, based on the other evidence without consideration of the facts disclosed in defendant's confession to Officer Gradoski.
[9] Troy called eight witnesses during the penalty phase to testify as to his general good behavior in prison, stretching back to his first periods of incarceration in Tennessee beginning at age eighteen.
[10] We note that this Court's decision in Smith was issued after the trial judge issued his sentencing order in the instant case.