EDWARDS, J.
Stephen Michael Duxbury appeals the judgment entered following a jury trial in which he was found guilty as charged of first-degree murder, attempted sexual battery with physical force, and burglary of an occupied dwelling with assault or battery. Duxbury was sentenced to life in prison without the possibility of parole for the murder and attempted sexual battery, together with another fifteen-year prison term for the burglary. The victim was a young woman who lived in the multi-story condominium building, Uptown Place, where Duxbury was a security guard. Duxbury claims that the trial court erred in denying his motion to suppress his post-Miranda statements and in denying his motion for judgment of acquittal on the attempted sexual battery with physical force. After careful review and consideration, we deny Duxbury's claims and affirm the judgment and sentence.
According to the evidence introduced at trial, at 1:45 a.m. on October 17, 2015, the victim was making an effort to return to her condo after an evening socializing and drinking with friends in downtown Orlando. Witnesses-strangers and friends alike-described her as being extremely intoxicated. She shared an Uber ride with two other young women ("Good Samaritans") to Uptown Place. Those Good Samaritans were concerned about her well-being because she was so intoxicated. They waited as the victim tried to use the keypad to enter Uptown Place; however, because she did not have her key fob, key, identification, or iPhone, she was unsuccessful. Before long, Duxbury, who was on duty at Uptown Place and dressed in a security guard uniform, approached the three women. After they explained the victim's predicament, Duxbury advised that he could not let anyone into the building without identification or proof that they were a resident, nor could he allow her to sleep on a couch in the building's lobby. As they continued to talk, a young male resident of the building opened the outside door and allowed the victim in.
*394 Instead of challenging the victim's entry into the building, Duxbury continued talking with the Good Samaritans, who expressed their concern to Duxbury as to how the victim would get into her unit without a key. The Good Samaritans eventually left and went across the street to their own building. In his statements to the police, Duxbury said that he then went looking for the victim. The jury saw video taken by surveillance cameras at Uptown Place that showed the victim wandering around the inside of the building, going from one floor to another, as she tried to find her own apartment. The video showed Duxbury following the victim on various floors and in various locations within Uptown Place for thirty to forty minutes. One eyewitness testified that Duxbury was trailing a short distance behind the intoxicated victim, rather than actually walking with her.
Duxbury later told police that the victim, at some point, had tried to enter her apartment by using a digital lock on her door, but she was not able to recall the code. Duxbury advised police that she told him that her key fob was in her car, so Duxbury started to go with her to the building's garage. However, Duxbury related that the victim suddenly said she recalled the code and headed back towards her apartment; Duxbury said he left her alone at that point. When he passed by her door later, she was nowhere to be seen.
The victim's friends became concerned when they were unable to contact her that afternoon and evening. They called the police, who eventually agreed to do a well-being check and met them outside Uptown Place. Although off duty, Duxbury approached the police and the victim's friends. Duxbury said he knew who they were concerned about before anybody told Duxbury whether the person of concern was a man or woman or her name. Police gained access to her apartment and they alone entered. Initially, they saw no sign of a struggle or any obvious criminal activity. Before long, they discovered the victim, dead, in her bed, wrapped in a comforter. The victim smelled of bleach and there were signs of bleaching around her, consistent with somebody attempting to clean her body to remove physical evidence.
The victim's shirt and bra had been ripped open in front. Her pants and underwear had been forcefully removed, leaving abrasions; those items of clothing were never recovered.[1] The medical examiner found evidence of blunt trauma to the victim's head, contusions on her upper body as though she had been repeatedly punched, defensive wounds on her arms, and other contusions and abrasions consistent with somebody forcefully restraining her. There was no direct evidence of consensual or forced intercourse, but the medical examiner discovered abrasions that were consistent with somebody attempting to have sex with the victim. The medical examiner testified that the cause of death was asphyxiation due to manual strangulation, and the death was ruled a homicide.
Duxbury completed his usual security guard daily report in which he mentioned his encounter with the victim, but did not mention the length of time that he followed her around nor report that he had removed bags of trash from the inside hallway. After being advised of his Miranda rights, Duxbury gave several statements to police in which he steadfastly maintained *395 that he had never, ever been in the victim's apartment. However, investigators found a print from his right thumb in her bathroom and a print from his left thumb on the nightstand in her bedroom. Furthermore, his DNA was found on the victim's breasts.[2] There were shoeprints in the apartment, including several that generally matched a pair of shoes recovered from Duxbury's home.[3] A police technician searched Duxbury's smartphone and determined that somebody had done an internet search using that phone, trying to learn how to override a Kwikset digital lock-the type of lock on the victim's door. That internet search was performed around five o'clock that morning, which coincided with a ninety-minute time period during which Duxbury is not seen on any video nor his location revealed by any other security-related patrol data.
MOTION TO SUPPRESS STATEMENTS TO POLICE
Duxbury gave a recorded statement to police shortly after the victim's body was discovered. He participated in a second interview that included a polygraph examination. Prior to trial he moved to suppress those statements, claiming that although he was given Miranda warnings and had signed a waiver of those rights, his statements were not voluntarily provided. In his motion to suppress, Duxbury relied upon Garrity v. New Jersey , 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).
Garrity involved statements obtained from police officers who had been explicitly warned that they would be fired if they did not cooperate with a police investigation implicating them. A New Jersey statute in place called for loss of tenure, forfeiture of employment, and loss of pension rights if one who was subject to that statute refused to testify by invoking the right against self-incrimination in a criminal proceeding. Garrity , 385 U.S. at 494 n.1, 87 S.Ct. 616. The Supreme Court reasoned that "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' " one's constitutional rights or to lose one's job. Id. at 498, 87 S.Ct. 616. Garrity held that the Fourteenth Amendment prohibits the use of statements obtained under such coercion, namely the threat of loss of employment, even if the defendant fails to claim or waives the privilege against self-incrimination. Id.
Here, a pretrial hearing was conducted during which Duxbury argued that he had a subjective fear that he would be fired from his security guard job if he did not cooperate with the police. Duxbury admitted that neither his supervisor nor the police explicitly or implicitly told him or suggested that he would be fired from his job unless he cooperated with and gave recorded statements to the police. Given the lack of any actual threats that he would be terminated, Duxbury relied upon section 493.6118(1)(o ), Florida Statutes (2015),[4] as providing a legal obligation to cooperate with police, arguing that it created a de jure threat that he would be fired if he refused to speak with the authorities.
*396 The trial court issued a detailed order denying Duxbury's motion to suppress, noting that he had conceded that no actual or implied threat of job loss was made and that the statutory provision was limited in scope and did not require cooperation with police in a criminal investigation. Duxbury renewed his motion to suppress during trial, and it was once again denied.
We agree with the trial court that section 493.6118(1)(o ) only requires security guards to cooperate with investigations conducted by the Department of Agriculture and Consumer Services, which is the licensing and disciplinary body overseeing security guards. That statute does not coerce a security guard to provide statements to police under threat of losing his job.[5] Given the absence of any evidence of explicit, implicit or de jure threats that Duxbury would lose his job if he did not provide recorded statements to police, we agree with the trial court that Garrity is inapplicable and find that the trial court did not err in denying the motion to suppress. No other basis for excluding Duxbury's statements to police has been argued; thus, they were properly admitted into evidence for the jury's consideration.
MOTION FOR JOA AS TO ATTEMPTED SEXUAL BATTERY
Duxbury argues that the trial court erred in denying his motion for judgment of acquittal regarding the crime of attempted sexual battery with force. "In moving for a judgment of acquittal, a defendant 'admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.' " Chamberlain v. State , 881 So.2d 1087, 1104 (Fla. 2004) (quoting Darling v. State , 808 So.2d 145, 155 (Fla. 2002) ). "[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Davis v. State , 207 So.3d 177, 195 (Fla. 2016) (quoting Reynolds v. State , 934 So.2d 1128, 1145 (Fla. 2006) ).
Duxbury claims that there was only circumstantial evidence that an attempted sexual battery occurred, requiring the State to either rebut or introduce competent, substantial evidence that is inconsistent with Duxbury's reasonable hypotheses of innocence. Duxbury's primary hypothesis was that there was no sexual battery. Although there was no evidence of actual intercourse, the crime charged was attempted sexual battery. As discussed above, the victim had numerous abrasions on her body consistent with an attempted sexual battery, and Duxbury's DNA was found on her breasts. This was circumstantial evidence inconsistent with Duxbury's *397 hypothesis of innocence, and it was sufficient evidence to allow the jury to decide the issue of guilt. See Johnson v. State , 238 So.3d 726, 742 (Fla. 2018) ("It is 'the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.' " (quoting State v. Law , 559 So.2d 187, 189 (Fla. 1989) ) ).
Duxbury's alternative hypothesis of innocence was that perhaps the victim had invited him into her apartment where they had consensual sex.[6] That hypothesis contradicts Duxbury's argument that there was no evidence the victim had engaged in consensual or forced sex. Additionally, that hypothesis of innocence was contradicted by Duxbury's own statements to police that the victim did not invite him into her apartment that early morning, and that he had never been in her apartment. Finally, evidence suggested that the victim was too intoxicated, with a .239 grams/deciliter blood alcohol level, to have had the capacity to consent to sex that night, which further conflicts with Duxbury's hypothesis of innocence, as does the evidence of the violence inflicted upon her.[7]
We find that the motion for judgment of acquittal was properly denied, as there was competent, substantial evidence to support a jury's verdict that a sexual battery with physical force had been attempted and that Duxbury was the perpetrator of that crime. "The [defendant's] conviction is supported by sufficient evidence where a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the State." Knight v. State , 186 So.3d 1005, 1010-12 (Fla. 2016).
For the reasons set forth above, we affirm.
AFFIRMED.
ORFINGER and GROSSHANS, JJ., concur.

Security video depicted Duxbury carrying several bags of trash from the building into the parking garage on the floor where his car was parked and where a dumpster was located. It was very unusual for security guards to remove trash from the building, and the length of time that elapsed after Duxbury entered the garage led the State to suggest that Duxbury may have put those bags in his car rather than throwing them away.

According to the State's expert, the DNA obtained from the scene matched fourteen of fifteen marker locations on Duxbury's DNA sample, giving the statistical probability of seven hundred billion to one that it was Duxbury's DNA.

The shoes in question recovered from Duxbury's home were a popular brand and a common size with nothing more to match the shoe prints to those particular shoes.

Chapter 493 applies to the Department of Agriculture and Consumer Services' regulation of private investigators, private security guards, and repossession agents. Section 493.6118(1)(o ) states that grounds for disciplinary proceedings include: "Failure or refusal to cooperate with or refusal of access to an authorized representative of the department engaged in an official investigation pursuant to this chapter." See § 493.6101(1) (defining "Department" as "the Department of Agriculture and Consumer Services").

In a case relied upon by Duxbury, but which supports the trial court's ruling, Minnesota v. Murphy , 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), the Supreme Court found that a probationer was not deterred from claiming self-incrimination by any reasonably believed threat of revocation of probation if he refused to confess to his probation officer. Id. at 432-40, 104 S.Ct. 1136. In the absence of such a threat, he was not coerced into waiving his constitutional rights. Id.

Duxbury did not testify at trial. There was certainly no evidence to support this hypothesis of innocence.

See Troy v. State , 948 So.2d 635, 647 (Fla. 2006) (holding that evidence "victim was found completely nude, with her underwear and torn bra next to her body," coupled with the "great deal of violence inflicted upon the victim," was sufficient evidence for the trial court to have submitted the charge of attempted sexual battery to the jury).