ROTHENBERG, J.
The defendant, Abel Rodriguez, was tried and convicted for committing the following offenses: two counts of dispensing drugs without a pharmacist’s license charged in counts six and fourteen of the information, and two counts of adulteration or misbranding of drugs charged in counts nine and seventeen. Following the jury’s verdict, the trial court granted the defendant’s motion for judgment of acquittal notwithstanding the verdict as to counts nine and seventeen, adulteration or mis-branding of drugs. The State appeals the order granting judgment of acquittal as to adulteration or misbranding of drugs (counts nine and seventeen), and the defendant cross appeals the judgment of guilt as to the two remaining counts, dis *156 pensing drugs without a pharmacist’s license (counts six and fourteen). The appeals were consolidated and both appeals are based on the sufficiency of the evidence presented. Because the record reflects that there was more than ample evidence to support the jury’s verdict as to all four counts, we reverse the trial court’s order granting a judgment of acquittal as to counts nine and seventeen, and we affirm the judgment of guilt as to counts six and fourteen.
STANDARDS OF REVIEW
In moving for a judgment of acquittal, the defendant admits all facts and evidence adduced at trial, and all reasonable inferences that may be drawn from the evidence must be viewed in the light most favorable to the State. Beasley v. State, 774 So.2d 649, 657 (Fla.2000), When a defendant moves for a judgment of acquittal on the basis of the sufficiency of the evidence, as the defendant did here, he admits not only the facts established by the evidence, but also every conclusion favorable to the State that a jury might fairly and reasonably infer from the evidence. Boyce v. State, 638 So.2d 98, 99 (Fla. 4th DCA 1994).
We review the trial court’s order granting the defendant’s motion for judgment of acquittal as to counts nine and seventeen de novo, see Troy v. State, 948 So.2d 635, 645-46 (Fla.2006); Pagan v. State, 830 So.2d 792, 803 (Fla.2002), and our review is based on the sufficiency of the evidence. Because the defendant’s appeal as to the judgments of guilt entered as to counts six and fourteen are also based on the sufficiency of the evidence, our review in these consolidated appeals is whether there was sufficient evidence to sustain the jury’s verdicts. Unless there is no view of the evidence upon which the jury could find the defendant guilty that can be sustained under the law, the convictions should stand. Williams v. State, 967 So.2d 735, 755 (Fla.2007).
THE CHARGES
A. Counts Nine and Seventeen — Adulteration or Misbranding of Drugs
Counts nine and seventeen charged that the defendant, along with several co-defendants; “did unlawfully and knowingly adulterate a drug intended for distribution and/or did unlawfully and knowingly repackage, sell, deliver, or hold or offer for sale any drug that was misbranded or adulterated, in violation of Florida Statutes 499.0691(3)(b), 499.0691(3)(a), and 777.011.” Count nine pertains to the “Nuria’s operation,” and count seventeen pertains to the “Santa Clara operation.”
Section 499.0691(3), Florida Statutes (2003), provides[1] in pertinent part, as follows:
(3) Any person who violates any of the following provisions commits a felony of the second degree....
(a) Knowingly manufacturing, repackaging, selling, delivering, or holding or offering for sale any drug that is adulterated or mis-branded or has otherwise been rendered unfit for human or animal use.
(b) Knowingly adulterating a drug that is intended for further distribution.
Section 499.003(37), Florida Statutes (2003)[2], defines “repackage” as including *157 “repacking or otherwise changing the container, wrapper, or labeling to further the distribution of the drug....”
(emphasis added).
Section 499.006, Florida Statutes (2003), provides, in relevant part, as follows:
A drug or device is adulterated:
[[Image here]]
(2) If it has been produced, prepared, packed, or held under conditions whereby it could have been contaminated with filth or rendered injurious to health;
(3) If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with, current good manufacturing practices to assure that the drug meets the requirements of ss. 499.001-499.081....
[[Image here]]
(10) If it is a legend [i.e., prescription] drug ... that has been purchased, held, sold, or distributed at any time by a person not authorized under federal or state law to do so.
(Emphasis added). Further, a drug is “misbranded” “[i]f its labeling is in any way false or misleading.” § 499.007(1), Fla. Stat. (2003).
B. Counts Six and Fourteen — Dispensing Drugs Without a Pharmacist’s License
Counts six and fourteen charged that the defendant, along with several co-defendants:
did unlawfully fill, compound, or dispense prescriptions or dispense medicinal drugs and at such time did not hold an active license as a pharmacist, was not registered as an intern, or was not an intern acting under the direct and immediate personal supervision of a licensed pharmacist in the State of Florida, in violation of Florida Statutes 465.015(2)(b), 465.015(4) and 777.011.
The language used to charge the defendant in these two counts tracks the language of section 465.015(2)(b), Florida Statutes (2003), and therefore will not be repeated here. Section 465.015(4), Florida Statutes (2003), provides that a violation of the above constitutes a third degree felony.
Section 777.011, Florida Statutes (2003), which is charged in all four counts, is the “principal” statute, which provides:
Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.
THE EVIDENCE
The evidence presented is as follows. The defendant, who had been in the pharmaceutical business for thirty-five years, first in New Jersey and then in Miami beginning in the late 1990’s, decided to expand his operation by getting involved in the internet pharmacy business. At the beginning, he began “capturing” applications for pharmaceuticals; a doctor would sign off on the applications; the prescriptions would be filled at one of the defendant’s pharmacies, usually at Nuria’s La Familia Pharmacy (“Nuria’s”), located on 22nd Avenue and N.W. 11th Street in Mia *158 mi; the prescriptions would be shipped to the customers; and the defendant would get a “service fee” for filling the prescriptions.
Eventually, the defendant hired Freddy and Danny Davila to set up an internet company, RX Hot Deals, where the defendant advertised for and created his own internet pharmaceutical business. The orders generated by RX Hot Deals were processed at either A.R. & Associates, the defendant’s company, where the operation was managed, located at the Ocean Bank Building on LeJeune, or at Nurias’s, where the defendant spent most of his time and on a daily basis.
To run the internet operation, the defendant obtained several pharmacy licenses. These licenses enabled him to order pharmaceuticals from wholesalers and to dispense them from those locations. Nuria’s was an active operating pharmacy. However, the internet operation at that location was totally separate from the legitimate pharmacy being operated there, which will be discussed in detail in this opinion. The defendant also acquired pharmacy licenses for Universal Pharmacy (“Universal”), located at 1740 S.W. 57th Avenue, and International Latin Medical Corp. (“International”), located on 184th Street. However, Universal and International were not active pharmacies. The defendant simply purchased the licenses and rented the space to allow him to purchase and dispense the drugs.
Although the law requires that prescription drugs be stored in a locked area, filled by a licensed pharmacist or under the direct supervision of a licensed pharmacist, processed at a licensed pharmacy, and dispensed from the pharmacy to which they were delivered, none of the drugs were filled or dispensed from either Universal or International. Instead, they were stored, filled, and dispensed at either 2290 S.W. 8th Street (“the Santa Clara location”), which was a closed nightclub/bar, or at the back room operation at Nuria’s. No pharmacist was present or oversaw the filling or dispensing of the prescriptions processed at Nuria’s or the Santa Clara location. The drugs stored and processed at Nuria’s were not kept in a locked area, and the Santa Clara location was dirty and the pill counters were not properly cleaned.
Law enforcement began investigating the defendant’s operation, and on October 25, 2004, while they were surveying the Santa Clara location (the closed nightclub located next to, but not a part of, an actual pharmacy), they observed Gus Rodriguez, one of the defendant’s employees, removing large garbage bags from the Santa Clara location and loading them into his vehicle. With his permission, they searched the garbage bags, which revealed numerous packages with UPS shipping labels.[3] The packages contained various prescription drugs, which were identified as being shipped from other locations rather than where they had been filled and were being shipped from. For example, one package labeled as containing Hydro-codone, specified that it was being shipped from 6955 N.W. 52nd Street in Medley although it had been filled at and was being shipped from the Santa Clara location, which was not a pharmacy, but rather a closed nightclub, and had no pharmacist on site monitoring the process.
Agent Venema testified that they took samples of some of the medications seized from Gus Rodriguez’s vehicle that Rodri *159 guez had just picked up from the Santa Clara location, and had them tested. The samples tested were proven to be Al-prazolam, a Schedule 4 controlled drug used as a tranquilizer; Carisoprodol, a muscle relaxant; Phentermine; and Am-bien. Neither the defendant nor anyone else possessed a license to store, package, or distribute these drugs or any other prescription medication at that location.
Based on this evidence, a search warrant was obtained and executed that same day at the Santa Clara location. At the Santa Clara location law enforcement observed racks of large containers of pharmaceuticals still in the manufacturer’s containers with labels on them reflecting that they had been shipped to Nuria’s and that they contained Hydrocodone. Agent Venema testified that law enforcement seized 6,000 Hydrocodone pills contained in twelve of these large manufacturer’s bottles. They also found labels for International Pharmacy, bottled drugs ready for dispensing with no labels on them, dirty pill counters, other pharmaceuticals including Diazepam (a generic drug for Valium), Alprazolam (a tranquilizer and generic for Xanax), Vico-din, Codeine, and Hydrochloride, and various invoices reflecting shipments purchased from wholesalers which were sold and shipped to International and Universal (non-functioning pharmacies) for Ambien, Zoloft, Viagra, Hydrocodone, Diazepam, and Alprazolam.
Several of the defendant’s employees testified and explained the defendant’s illegal internet pharmacy operation. Michael Hernandez, who was not a pharmacist, testified that he began working for the defendant at Nuria’s in 2003, filling prescriptions and printing computer labels. He explained that the internet pharmaceuticals were kept in a totally different area than the pharmaceuticals dispensed from Nuria’s pharmacy. Also whereas a pharmacist supervised Nuria’s pharmacy dispensary, “the pharmacists never ventured over to the internet side of the location,” and he never saw a pharmacist overseeing the dispensing of drugs from the defendant’s internet operation.
Hernandez testified that he filled prescriptions for Hydrocodone at Nuria’s, but outside of its dispensary, by removing sixty or ninety of the pills from the manufacturer’s bottles, placing them in smaller bottles, labeling them, boxing them, and shipping them via FedEx or UPS. The labels, however, did not state that they were being dispensed from Nuria’s. In August, Hernandez was moved to the Santa Clara location where none of the drugs were locked up, no pharmacist was ever present, and there was no license to operate as a pharmacy. Hernandez testified that he personally picked up the drugs that were delivered to Nuria’s and Universal (a non-functioning pharmacy) and took them to the Santa Clara location several times a week where he filled the prescriptions, labeled the bottles, and dispensed the drugs without supervision and without doctor approval.
Arturo Aleman, who worked for the defendant for approximately one year and is not a pharmacist, testified that he downloaded 300 to 800 prescriptions a day, and he and others dispensed drugs from the Santa Clara location, although there was no pharmacist at that location. He explained that although a doctor signed the prescriptions at the beginning, after a while, they stopped calling him. Some of the drugs were delivered to Universal and then transported to the Santa Clara location, where they would be transferred into smaller bottles and subsequently (sometimes days later) labeled and shipped. Aleman testified that he reported directly to the defendant, met with him daily at Nuria’s, provided him with a daily report *160 with the production numbers, and took his orders directly from the defendant.
Emilio Urrutia, who knew the defendant from New Jersey, was recruited by the defendant to help him run his pharmaceutical business. He explained that at the beginning, after orders were taken, a doctor would come to the defendant’s company, A.R. & Associates, to write out the prescriptions, and the prescriptions were then filled by pharmacists at Nuria’s. When the internet operation began running, however, the defendant set up a separate operation at Nuria’s. The internet operation was conducted outside of the locked pharmacy dispensing area and orders were filled without the supervision of a pharmacist. He further testified that the defendant “ran the show,” was “the decision maker,” set the prices, determined which drugs would be dispensed, and was the one who decided to begin filling orders for Hydrocodone, which they filled at the Nuria’s internet dispensing area. In 2004, the defendant decided to move the operation to the Santa Clara location where it could not be seen. “[I]t was very dark and dirty ... a hidden place.” Emilio’s job was to order the drugs. He ordered Hydrocodone, Phen-termine, Viagra, and other drugs from Top RX and Sunrise Wholesale (“Sunrise”), two wholesalers. The drugs were delivered to Nuria’s, Universal, International, and the Santa Clara location. These various locations were used because the defendant told him to spread the orders out so as not to “raise a flag.” Consequently, although drugs were ordered from and shipped to a licensed pharmacy, such as Universal, the drugs were then picked up and delivered to the Santa Clara location where they were dispensed in violation of the law because there was no license to dispense from the Santa Clara location and the law requires that the drugs be dispensed from the pharmacy they were ordered from and delivered to.
Emilio was with the defendant when he worked out a deal with the owners of International and Universal to use their pharmacy licenses and to rent their locations. International and Universal were not operating as pharmacies. The defendant did not want to call attention to the Santa Clara operation, so he instructed them to deliver the prescriptions filled at the Santa Clara location to FedEx and UPS, rather than allowing these companies to pick up the orders. He also explained that, although at the beginning they had Dr. Castillo (who never saw any of the patients) sign the prescriptions, it was costing them a lot of money, so the defendant instructed him to fire Dr. Castillo. The defendant told Emilio that he had Dr. Castillo’s signature on file and they could use the internet signature. When Emilio became uncomfortable with the operation, he talked to the defendant about shutting it down, and the defendant told him they would just do it for a few more months.
Emilio explained that the defendant was “the boss of these operations,” nothing was done without his approval, and that he and Arturo “were simply employees, following [the defendant’s] orders.” The defendant instructed Arturo Aleman and Michael Hernandez not to put the name of any of the pharmacies on the labels so the drugs could not be traced to his pharmacies in case something happened. Emilio testified that the defendant put the plan together, financed it, owned and ran all of the companies, ran the operation through A.R. & Associates, put key people in each of the locations, set the prices, found the wholesalers.
ADULTERATION OR MISBRANDING OF DRUGS
Although the defendant was convicted in counts nine and seventeen of *161 adulteration or misbranding of drugs in violation of sections 499.0691(3)(a) and/or (b), the trial court granted the defendant’s motion for judgment of acquittal as to these counts based on a finding that the State failed to prove that any of the items seized/dispensed were, in fact, drugs. This was error.
First, we note that some of the prescriptions filled and seized at the Santa Clara location were tested. Agent Venema testified without objection that samples of the drugs, which had been bottled and packaged for shipping and were being loaded into Gus Rodriguez’s vehicle to be dropped off at UPS, were tested. It was undisputed that the tested samples were proven to be Alprazolam, a Schedule 4 controlled drug used as a tranquilizer; Carisoprodol, a muscle relaxant; Phentermine; and Am-bien.
Second, various witnesses testified without objection that prescriptions for various pharmaceutical drugs were filled and dispensed from Nuria’s and the Santa Clara location, and other witnesses identified some of the drugs found when the search warrants were executed at both locations. For example, Michael Hernandez testified that when he worked for the defendant at the Santa Clara location, he personally filled prescriptions for Hydroco-done (dispensing 500 to 1000 pills a day); he was charged with and pled guilty to trafficking in Hydrocodone, dispensing drugs without a license, and adulteration or misbranding of drugs in connection with his involvement in the defendant’s internet pharmacy operation; and he has or had his own pharmacy where he sells or sold Hy-drocodone (thus demonstrating his ability to identify Hydrocodone).
Emelio Urrutia testified without objection that he was responsible for ordering the drugs for the defendant’s internet pharmacy operation. He ordered Hydro-codone, Phentermine, Viagra, and other drugs from Top RX and Sunrise; the drugs were delivered to Universal, International, Nuria’s, and the Santa Clara location; and the drugs then were transported to Nuria’s or the Santa Clara location, where they were divided into smaller prescription bottles and dispensed. Michael Schwerdt, who also worked for the defendant, testified, without objection, that he distributed Hydrocodone, Alprazolam, Xa-nax, and Zoloft for the defendant. Carlos Varón, who was a one-half owner of Sunrise, one of the pharmaceutical wholesale companies used by the defendant, confirmed that he sold and delivered Hydro-codone to the Nuria’s and Universal locations. Additionally, the State introduced several invoices documenting these transactions.
Third, there were additional law enforcement witnesses who identified some of the prescription drugs found at the Santa Clara and Nuria’s locations which, as already addressed, were dispensing prescription drugs without a license. Agent Venema, who was present when the search warrants were executed at these two locations, testified, without challenge, that they found racks stacked with twelve large bottles containing 6,000 Hydrocodone pills at the Santa Clara location still packaged in the manufacturer’s bottles with labels, reflecting that they were ordered from and shipped to Nuria’s, and numerous prescription-sized bottles filled with Hydroco-done pills. He additionally identified a bottle of Alprazolam and a package labeled as Hydrocodone ready for shipment to a person in Vermont. Photographs documenting his testimony were also introduced.
Cesar Arias, a registered pharmacist since 1977, who worked for the Florida Department of Health as an investigator and supervisor for the Bureau of Pharma *162 cy Services for eighteen years, testified that he was working with the Florida Department of Law Enforcement (“FDLE”) when the search warrants were executed to assist FDLE agents in identifying the pharmaceuticals. Mr. Arias identified, without challenge, some of the seized items, including Acetaminophen with Codeine # 4, a Schedule 8 controlled substance; Diazepam found in unlabeled bottles (and introduced as State’s exhibits 14, 20, and 24); and Alprazolam, a Schedule 4 controlled substance. Special Agent Larry Andres also testified that he was present when the search warrants were executed. He identified, without objection, State’s exhibit 36 as Vicodin, Hydrocodone, Codeine, and Hydrochloride, seized at the Santa Clara location.
Thus, contrary to the trial court’s ruling, there was competent, and we conclude, substantial evidence upon which the jury could and did find that the items seized and being dispensed were drugs. Although this was the sole ground upon which the trial court based its judgment of acquittal not withstanding the jury’s finding of guilt as to counts nine and seventeen, misbranding and/or adulteration of drugs, we briefly address the proof regarding misbranding and/or adulteration.
Specific to this defendant’s prosecution, it is illegal to hold, repackage, offer for sale, or deliver any drug that has been adulterated or misbranded. § 499.0691(3). A drug is adulterated if it has been held or packaged under conditions where it could have been contaminated or rendered injurious to health; if the facility or the methods used at the facility to hold, process or package the drugs do not conform with the requirements of section 499.001-.081; or held or distributed by a person not authorized under federal or state law. § 499.006. A drug is misbranded if its labeling is in any way false or misleading. § 499.007(1). There was ample evidence of both adulteration and misbranding.
The conditions at the Santa Clara location were unsanitary, and the fact that the prescriptions were being filled and dispensed at both the Santa Clara and Nuria’s locations without review by a physician, without the supervision of a pharmacist, unsecured and left in containers for distribution without any labels, clearly constitutes conditions where the drugs could have been contaminated or rendered injurious to health, § 499.006(2). These facts demonstrate that the facilities and methods used did not conform to the requirements of section 499.001-.081, § 499.006(3), and the facts detailed earlier show the drugs were being held and distributed by individuals not authorized to do so under federal or state law, § 499.006(10). The drugs were additionally labeled in a false or misleading way. See § 499.007(1) (providing that a drug is misbranded “[i]f its labeling is in any way false or misleading”).
Cesar Arias, the investigator and supervisor for the Florida Department of Health, Bureau of Pharmacy Services, testified that only a licensed pharmacist can dispense a valid prescription from a licensed pharmacy authorized to dispense pharmaceuticals; pharmacy technicians must work under the direct supervision of a licensed pharmacist; all drugs must be stored in a dispensary and all dispensaries must be locked; a drug is misbranded if not fully labeled; the label must reflect the name, address, and telephone number of the pharmacy that repackaged it; and the drugs must be dispensed from the pharmacy that ordered and received the drugs from the wholesaler.
As has already been addressed in this opinion, each and every one of these regulations was violated and each constitutes adulteration and/or misbranding. The *163 drugs were ordered by Universal and International, which were licensed but not operating pharmacies, and Santa Clara, which was not a pharmacy at all. The drugs were then transferred to Nuria’s and the Santa Clara location for repackaging and distribution. Therefore, as soon as the drugs were transferred, they were misbranded. They were not stored in a locked dispensary; the prescriptions were filled without supervision of a licensed pharmacist; repackaged drugs were lying around without any labels; and the labels that were ultimately applied did not, pursuant to the defendant’s explicit orders, identify the pharmacy that they were being dispensed from. Each of these practices is adulteration or misbranding of the drugs.
Because the evidence overwhelmingly establishes the defendant’s guilt and clearly supports the jury’s verdicts in counts nine and seventeen, we reverse the trial court’s order granting judgment of acquittal with instructions to reinstate the verdicts of guilt and to sentence the defendant on those two counts.
DISPENSING DRUGS WITHOUT A PHARMACIST’S LICENSE
The defendant appeals his conviction in counts six and fourteen for dispensing drugs without a pharmacist’s license. Because the record contains overwhelming competent evidence to support the jury’s findings, we affirm. The drugs being dispensed from Nuria’s and the Santa Clara location were dispensed by individuals who were not licensed pharmacists and who were not under the direct supervision of a licensed pharmacist. There was also substantial competent evidence to support the jury’s finding that the drugs being dispensed at these two locations were under the control of and were being dispensed at the direction of the defendant, who owned both locations, provided the financial resources to fund the operation, received substantial monetary benefit from the operation, and otherwise managed it. We therefore affirm the defendant’s convictions as to counts six and fourteen.
Judgment of conviction for counts six and fourteen affirmed; judgment of acquittal for counts nine and seventeen reversed, with instructions to reinstate verdicts of guilt and to sentence the defendant accordingly.

. Section 499.0691(3) was amended and renumbered in 2008 and is now section 499.0051(14).

. The current definition of "repackage” is found in section 499.003(49), Florida Statutes (2011), which defines "repackage” as including "repacking or otherwise changing the *157 container, wrapper, or labeling to further the distribution of the drug....”

. Michael Hernandez, who worked for the defendant and filled prescriptions at the Santa Clara location, testified that each garbage bag contained from fifty to sixty packages; usually ten bags were picked up for each run; and they would make several runs a day.