[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10516
_____

D.C. Docket No. 8:11-cv-00796-JSM-AEP

JOHN TROY,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 15, 2014)

Before MARCUS, PRYOR, and MARTIN, Circuit Judges.

MARCUS, Circuit Judge:

John Troy, a Florida prisoner sentenced to die for the murder of Bonnie

Carroll, seeks a writ of habeas corpus. During the penalty phase of trial, the state

court excluded testimony from corrections officer Michael Galemore about general conditions in Florida prisons for those serving life sentences, including the nature of custody and the availability of illegal drugs.  Galemore had never met Troy and had no firsthand knowledge of his character, record, or conduct.  Still, Troy argues that this exclusion violated his Eighth and Fourteenth Amendment right to present mitigation evidence bearing on his capacity for rehabilitation and his ability to contribute in prison, see Eddings v. Oklahoma, 455 U.S. 104, 114 (1982), as well as his Fourteenth Amendment right to present a complete defense by rebutting cross-examination, see Crane v. Kentucky, 476 U.S. 683, 690 (1986).  The Florida Supreme Court rejected these arguments on direct appeal, as did the federal district court on collateral review.

We affirm the district court's denial of habeas relief.  Though a capital sentencer must be allowed to consider relevant mitigating evidence, the Supreme Court has refused to limit "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."  Lockett v. Ohio, 438 U.S. 586, 605 n.12 (1978).  Similarly, while the Fourteenth Amendment ensures a meaningful opportunity to present a complete defense, state courts may "exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability."  Crane, 476 U.S. at 690.  Galemore would have said nothing about

2

Troy's character, conduct, or individual qualities, and could only have guessed about Troy's potential conditions of imprisonment. Thus, the Florida Supreme Court did not act contrary to and did not unreasonably apply clearly established Supreme Court law when it denied relief on the ground that Galemore's testimony was irrelevant and speculative. See 28 U.S.C. § 2254(d)(1).

Moreover, even if the decision to exclude Galemore's testimony had been error, it would have been harmless because Troy has not established that keeping out Galemore's testimony "had substantial and injurious effect or influence" on the jury's death recommendation. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Troy, a convicted violent felon on probation in two states, committed a grisly slaying in the course of a robbery and sexual assault. The extensive mitigating evidence presented -- including testimony about Troy's drug use, his troubled background, and his constructive conduct during previous prison terms -- did not come close to balancing the powerful aggravators. We see no reason to suspect that the jury, which voted eleven to one for death, would have made a different recommendation had Galemore testified.

## I.

When it rejected on direct appeal Troy's arguments about the exclusion of Galemore's testimony, the Florida Supreme Court found the following essential

3

facts.  See Troy v. State, 948 So. 2d 635, 638-42 (Fla. 2006) (per curiam).  John Troy was charged with first degree murder, armed burglary, armed robbery, and attempted sexual battery with a weapon for his fatal attack of Bonnie Carroll.  Troy was also charged with the armed burglary, aggravated battery, armed kidnapping, and armed robbery of Traci Burchette.

Evidence presented at the guilt phase of the trial established that John Troy had lived with his mother and girlfriend in the same apartment complex as Bonnie Carroll since his release from prison on July 25, 2001.  Troy, who had been serving a sentence for armed robbery, was placed on conditional release that required regular drug testing.  After Troy told his probation officer that he had smoked marijuana in prison, his first scheduled drug test was delayed until September 11, 2001.  When Troy tested positive for cocaine that day, his probation officer told him that he would be re-incarcerated.  That night, as the nation mourned an unspeakable tragedy, John Troy committed murder.

Upon failing the drug test, Troy returned to his apartment and began to argue with his girlfriend.  He left with a kitchen knife and did not return.  He visited Melanie Kozak, with whom he used cocaine a total of four times on September 11 and 12 -- three times before the murder and once after.  At approximately 12:30 a.m. on September 12, Troy pounded on the sliding glass door of a neighbor, Karen Curry, who called police and did not let him in.  Between his 12:30 a.m.

4

encounter with Curry and a 2:00 a.m. visit to Kozak, Troy killed Bonnie Carroll.

Carroll's naked body was found in her Sarasota, Florida, apartment in the late afternoon of September 12, 2001. She had numerous stab wounds to the front of her body, large neck incisions, and blunt force injuries around her face. An electrical cord was tied around her thigh and a cloth was slung around her neck. An autopsy revealed a bloody, folded piece of cloth had been wedged in the back of her throat when she was still alive. The cloth around her neck and petechial hemorrhages in her eyes possibly indicated strangulation. Carroll showed small, fresh injuries to her external genitalia and thighs, though there were no internal injuries and no identified semen. A medical examiner testified that the evidence was consistent with an assailant attempting to sexually batter the victim before she was killed. An X-ray showed a knife blade broken off inside Carroll's body. A matching, bladeless knife handle recovered from the countertop in her bathroom contained the blood of Carroll and Troy. Carroll's blood was also present on a steak knife found near her body. Tests showed no drugs in Carroll's system. Her blood alcohol level, 0.037, was consistent with having a glass of wine. In total, Carroll suffered at least fifty-four injuries, including forty-four stab wounds, three incise wounds to the neck, seven impact injuries to the face, and multiple defense wounds on her hands.

After killing Carroll, Troy visited Kozak, again used cocaine, and left to

5

drive around in Carroll's car.  He showed up at the home of Traci Burchette, a friend of Troy's mother, at approximately 6:30 a.m.  Troy picked up a two-by-four board in her backyard before knocking on Burchette's door.  He told her his car had broken down and pretended to call a friend.  She made him coffee and, at Troy's request, leaned down to turn on her computer.  Without warning he attacked from behind, breaking her knuckles and fracturing her skull.  Troy bound and gagged Burchette and stole her car keys and ATM card.  Troy tried to use her ATM card at a bank at 8:24 a.m. and then headed south on Interstate 75 toward Naples, Florida.  Burchette managed to contact police and give a description of her car and her assailant.  Police in Naples stopped Troy in the midafternoon of September 12 in Burchette's car with a female passenger.

When arrested, Troy was wearing tennis shoes that contained Carroll's blood, blue jeans with blood from both Carroll and Burchette, and a T-shirt with Burchette's blood.  Tests of Carroll's fingernails showed Troy's DNA.  A shard of broken glass found next to Carroll in her bedroom tested positive for Troy's blood.  A drinking glass on Carroll's kitchen counter contained Troy's fingerprint.  Police found the two-by-four board with Burchette's blood along the highway near Fort Myers.

At trial, Troy's counsel acknowledged that Troy had killed Carroll and attacked Burchette.  He argued for second-degree murder on the ground that the

6

killing was not premeditated or done during the commission of a felony. The defense put on evidence that Carroll had invited Troy in, that the two had been socializing before their argument, and that Troy used drugs in her apartment. Despite Troy's defense, the jury found him guilty of first-degree murder and all other charges.

During the penalty phase, the prosecution highlighted Troy's four prior felony convictions (three for armed robbery and one for aggravated assault with a weapon) and his contemporaneous convictions for the attack on Burchette. The State established that Troy was on probation in both Florida and Tennessee. Prosecutors also presented three victim impact statements.

Troy offered extensive penalty-phase mitigation evidence, stressing his childhood and background, his behavior in and adaptation to prison, his potential for rehabilitation if given a life sentence, and the effect of the terrorist attacks of September 11, 2001, on Troy's explosion of violence. In all, he called twenty-nine mitigation witnesses. Numerous family members and character witnesses testified for Troy, as did Dr. Michael Maher, a clinical and forensic psychiatrist. Dr. Maher testified about Troy's unstable, abusive childhood; the sexual molestation of Troy at age thirteen by a male teacher, including the isolation endured by Troy after he testified at the teacher's trial; Troy's arrested psychological development; his lifelong depression; his chronic drug addiction; Troy's response to the September

7

11 attacks; and his acute intoxication during Carroll's murder.

As part of the defense's mitigation case during the penalty phase, Troy proffered testimony from Michael Galemore, an assistant warden at the Polk County Correctional Institution. Troy's counsel admitted to the court that Galemore had no personal contact with the defendant and knew none of the facts of his particular case. Still, Troy intended to call Galemore to testify that a prisoner serving a life sentence without possibility of parole would be held in "close custody," where he "would be supervised in a particular fashion," "would work in prison," and "would have to follow the rules of the prison." Troy's counsel also stated that Galemore would testify about drugs in prison and inmate leadership. Finally, Galemore would testify about the conditions of confinement on death row: "that you are basically locked into your cell and you don't work."

The State objected to the presentation of Galemore's testimony on the grounds that it was irrelevant to any statutory or nonstatutory mitigating factors and speculative because Galemore had never met Troy and did not know where he would serve his sentence. The trial court sustained the State's objection and barred Galemore's testimony.

By a vote of eleven to one, the jury recommended Troy be put to death. At

8

the Spencer hearing,[1] defense counsel called a detective who had taken a previously suppressed confession from Troy to establish that Troy had accepted responsibility and expressed remorse for his crimes.  On cross-examination, the judge allowed the State to inquire into the details of the confession.  Troy had told the detective that he tied Carroll with an extension cord and knew she would call police if released.  The two began fighting when Carroll made disparaging remarks about Troy's girlfriend.  To quiet her, Troy said he shoved something in her mouth.  Troy also said he asked Carroll if she wanted to have sex, and she assented.  When Carroll got her hands free, the two began to fight.  Troy stabbed her with a knife and broken glass.  Troy stated he brought one knife with him and found the other in Carroll's kitchen.  After Troy thought he had killed her, he went to the kitchen to get money and keys from her purse.  When he returned to find her alive and struggling to sit up, Troy cut her throat.  Troy denied committing sexual battery but admitted that he took Carroll into the bathroom to "clean her up" before sex and that, because he tied her hands and feet, he had to cut off her clothing.  Troy told the detective that he had taken heroin, cocaine, and Paxil the night of the murder. (The trial court ultimately found that at the time of the attack Troy had been under the influence of marijuana, alcohol, and cocaine, but not Paxil or heroin.)  Troy

---

[1] Under Florida law, a Spencer hearing gives the defendant, his counsel, and the State the opportunity to be heard and to present additional evidence to the sentencing judge after the jury has offered its recommendation.  See Spencer v. State, 615 So. 2d 688, 681 (Fla. 1993) (per curiam).

9

said he was repulsed by what he had done, but he did not cry as he calmly confessed.

Troy offered allocutions of remorse at the Spencer hearing to the court and to Burchette. Though he had prepared one for Carroll's family, they requested he not give it. The trial court adopted the jury's recommendation and sentenced Troy to death. The court found four statutory aggravating factors: (1) the murder was especially heinous, atrocious, or cruel (great weight); (2) Troy was previously convicted of felonies involving the use or threat of violence (considerable weight); (3) Troy committed the murder while on felony probation (considerable weight); and (4) Troy committed the murder during the commission or the attempt to commit a robbery or sexual battery (considerable weight). The trial court also found that the murder was committed for pecuniary gain, but noted that considering this aggravator alongside the robbery factor would amount to double-counting.

The trial court found two statutory mitigating circumstances: impaired capacity (great weight) and extreme mental or emotional disturbance (moderate weight). The court found fifteen nonstatutory mitigating factors, including: Troy's dysfunctional family background; his positive personal characteristics and actions, as shown when he protected a correctional officer who had been a childhood friend during a prison incident; Troy's sexual molestation; his "triple addiction" to

10

alcohol, cocaine, and marijuana; his lifelong mental and emotional problems; his

potential for positive contributions if sentenced to life in prison; his expressions of

remorse; the fact that Troy is father to three children; and the fact that Troy is

intelligent and had obtained his G.E.D.  The court accorded these nonstatutory

factors little weight.

After he was convicted, Troy raised seven claims on direct appeal to the

Florida Supreme Court, including a claim that the trial court had erred in excluding

Galemore's testimony.  As he does now, Troy alleged that his Eighth and

Fourteenth Amendment right to present mitigation evidence had been violated

because Galemore's testimony was relevant to Troy's potential for rehabilitation

and his ability to contribute in a structured prison environment.  The Florida

Supreme Court rejected the claim, explaining:

> The trial judge made clear that defense counsel still had the right to argue potential parole ineligibility to the jury as a mitigating factor, to present evidence as to whether Troy would pose a threat to prison personnel or other inmates, and to argue whether he was well-suited to imprisonment.  Defense counsel made use of all of these options, presenting witnesses in mitigation regarding Troy's behavior in prison,[9] and arguing during closing that, if the jury chose life imprisonment, "John Troy will be in prison until the day he dies."
>
> [9] Troy called eight witnesses during the penalty phase to testify as to his general good behavior in prison, stretching back to his first periods of incarceration in Tennessee beginning at age eighteen.
>
> A trial court's ruling on the admission of evidence is reviewed by an appellate court under an abuse of discretion standard.  Randolph

11

v. State, 853 So. 2d 1051, 1062 (Fla. 2003) ("The admissibility of evidence lies in the sound discretion of the trial court and trial court decisions will be affirmed absent a showing of abuse of discretion.").

We conclude that the trial court did not abuse its discretion in excluding Galemore's testimony. First, it should be noted that Galemore's testimony was offered during the penalty phase of Troy's trial, which lasted over four and a half days. Defense counsel called twenty-nine witnesses during this phase, indicating that the judge was not categorically excluding mitigation evidence or the presentation of defense witnesses. Furthermore, Galemore had never met Troy, nor had he ever witnessed Troy during one of his periods of incarceration, making his potential assessment regarding Troy's possible prison experience entirely speculative. When considered in context of the entire penalty phase, the other witnesses called, and the arguments defense counsel nevertheless made regarding a possible life sentence, the exclusion of Galemore as a witness was not an abuse of discretion.

Troy, 948 So. 2d at 650-51.

On June 10, 2008, Troy filed a state court motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851 arguing, inter alia, that counsel failed to prepare Galemore. The state postconviction court summarily denied relief. Troy appealed to the Florida Supreme Court, again pressing his argument that counsel did not adequately prepare Galemore. The Florida Supreme Court affirmed because Troy had not demonstrated Strickland prejudice: "Viewed in the context of this case, we conclude that the absence of further testimony presented to the jury discussing Troy's possible prison experience does not establish a probability sufficient to undermine our confidence in his sentence of death." Troy v. State, 57 So. 3d 828, 836 (Fla. 2011).

12

On April 12, 2011, Troy filed a federal habeas petition in the United States District Court for the Middle District of Florida raising thirteen issues. Troy again argued that the trial court violated his constitutional rights by excluding Galemore's penalty phase testimony. The district court denied that claim, explaining that Troy failed to demonstrate a violation of his Eighth and Fourteenth Amendment rights because Galemore's testimony would not have addressed Troy's character, his prior record, or the circumstances of his offense. The district court denied the remainder of Troy's claims and refused to grant a certificate of appealability.

When Troy appealed to this Court, we originally refused to grant a COA. Upon Troy's motion for reconsideration, we issued a COA as to one question:

> Whether the trial court violated Troy's Eighth and Fourteenth Amendment rights at the penalty phase of his trial by excluding the proferred testimony of the Department of Corrections official, Michael Galemore, an assistant warden at the Polk County Correctional Institution, on the ground that Galemore's testimony was relevant to the mitigating factor of Troy's potential for rehabilitation and positive contribution in a structured prison environment.

## II.

### A.

We review de novo a district court grant or denial of a petition for habeas corpus. McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005). The district court's findings of fact are reviewed for clear error; questions of law and mixed

13

questions of law and fact are reviewed de novo.  Id.

Troy filed his federal habeas petition in 2011, after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Therefore, Title 28 U.S.C. § 2254 guides our review.  Under § 2254(d), federal courts cannot grant an application for a habeas writ with respect to any claim adjudicated on the merits in state court unless the state decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  In this case, the relevant state court decision came on direct appeal, when the Florida Supreme Court denied on the merits Troy's claim that the exclusion of Galemore's testimony violated the Eighth and Fourteenth Amendments.  Troy, 948 So. 2d at 650-51.

Troy does not argue that the Florida Supreme Court made an unreasonable determination of facts in denying his claim.  And Troy comes nowhere close to satisfying the stringent requirements of § 2254(d)(1).  "Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'"  Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir.

14

2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  Id. (alteration in original) (quoting Williams v. Taylor, 529 U.S. at 413).

For § 2254(d), clearly established federal law includes only the holdings of the Supreme Court -- not Supreme Court dicta, nor the opinions of this Court. White v. Woodall, 134 S. Ct. 1697, 1702 (2014).  To clear the § 2254(d) hurdle, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011). "[A]n 'unreasonable application' of [Supreme Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice."  Woodall, 134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).  A state court need not cite or even be aware of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); accord Richter, 131 S. Ct. at 784.  Troy must demonstrate that no fairminded jurist would have reached the Florida court's

15

conclusion. See Richter, 131 S. Ct. at 786-87; Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257-58 (11th Cir. 2012). "If this standard is difficult to meet, that is because it was meant to be." Richter, 131 S. Ct. at 786.

## B.

Troy argues that the trial court violated his Eighth and Fourteenth Amendment right to present mitigation evidence by keeping out Galemore's testimony. In Lockett, Chief Justice Burger's plurality opinion pronounced that the Eighth and Fourteenth amendments require that a sentencer be allowed to consider "any aspect of a defendant's character or record and any of the circumstances of the offense" that a defendant proffers as a mitigating factor in support of a sentence less than death. 438 U.S. at 604. Later Supreme Court majorities embraced the Lockett rule, explaining it as "the product of a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." Eddings, 455 U.S. at 110.

While it made personalized death sentencing a priority, the Lockett rule in no way "limit[ed] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604 n.12. In this case, Galemore's generalized testimony would not have addressed Troy's offense. It would have

16

shed no light on his prior record.  And it would have said nothing about Troy's character.  Instead, Galemore would have been called to testify "that, hypothetically, were Troy sentenced to life imprisonment, it would be considered close custody, that Troy would be supervised in a particular fashion, and that he would work while in prison," as well as that drugs "are not easily obtained" in prison.  Troy, 948 So. 2d at 650.  Galemore had never met Troy and had no knowledge of his character or conduct.  He could not even know which facility would house Troy if he was sentenced to life imprisonment.  Under Lockett, the Constitution presented no obstacle to the trial court's exclusion of Galemore's testimony as irrelevant.

Troy also invokes Skipper, in which the Supreme Court drew from Lockett the "rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'"  476 U.S. at 4 (quoting Eddings, 455 U.S. at 114).  In effect, Troy suggests that Skipper clearly established a constitutional requirement that sentencers be presented with all evidence even remotely bearing on any nonstatutory mitigating circumstance recognized by state law.  Skipper did not go so far.  In Skipper, the defendant proffered penalty phase testimony from "two jailers and one 'regular visitor' to the jail to the effect that petitioner had 'made a good adjustment' during his time spent in jail."  Id. at 3.  The Supreme Court held that the exclusion of these witnesses violated the

17

constitutional principles of Lockett and Eddings: "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." Id. at 5. However, in Skipper, the witnesses would have testified based on firsthand knowledge about the accused's previous conduct. Because he "had been a well-behaved and well-adjusted prisoner, . . . the jury could have drawn favorable inferences . . . regarding petitioner's character and his probable future conduct if sentenced to life in prison." Id. at 4. Ultimately, Skipper made clear that a prisoner's behavior in jail may be conduct relevant to mitigation. Yet in this case, the trial court allowed the petitioner to present just the sort of mitigation testimony that had been wrongfully excluded in Skipper: the jury heard extensive firsthand testimony from eight witnesses about Troy's behavior in prison. Troy, 948 So. 2d at 650 n.9. Corrections officers who had supervised him in the past told the jury that Troy was hard-working, helpful, and respectful, and that he eased tensions between guards and inmates. Galemore, in sharp contrast, could not offer Skipper testimony.

Nevertheless, Troy asks this Court to extend Skipper by requiring the presentation of any evidence -- personalized or not -- that might bear on a capital defendant's prospects in prison. But AEDPA prohibits us from applying any law not clearly established in Supreme Court holdings. Though Skipper referred to "any relevant mitigating evidence," it did not suggest, much less clearly establish,

18

that this category included testimony from witnesses who lacked particularized knowledge of the defendant and who could only speculate about the future penal conditions he might face.  Instead, the Lockett rule protects a defendant's right to present mitigating evidence particular to his person.  See Eddings, 455 U.S. at 112 ("By requiring that the sentencer be permitted to focus 'on the characteristics of the person who committed the crime,' the rule in Lockett recognizes that 'justice . . . requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender.'" (alterations in original)).  Personalized aggravating and mitigating factors are the essence of the "individualized consideration" mandated by the Eighth and Fourteenth Amendments.  Lockett, 438 U.S. at 605.  No Supreme Court precedent requires a sentencer to consider testimony of the kind proffered here.  See Hitchcock v. Sec'y, Fla. Dep't of Corr., 745 F.3d 476, 483 (11th Cir. 2014) ("Evidence of a rejected plea offer for a lesser sentence, like evidence of innocence or evidence of the geographical location of the crime, is not a mitigating circumstance because it sheds no light on a defendant's character, background, or the circumstances of his crime."); see also Williams v. Norris, 612 F.3d 941, 948 (8th Cir. 2010); Owens v. Guida, 549 F.3d 399, 419 (6th Cir. 2008); Stenson v. Lambert, 504 F.3d 873, 892 (9th Cir. 2007).  Nor has the Supreme Court taken away a trial court's power to limit speculative testimony merely because a defendant tags it as mitigation.  See,

19

e.g., United States v. Purkey, 428 F.3d 738, 756 (8th Cir. 2005) ("[The Lockett rule] does not mean that the defense has carte blanche to introduce any and all evidence that it wishes."). Quite simply, Florida's high court did not unreasonably apply clearly established Supreme Court law in denying Troy's claim.[2]

## C.

Troy also argues that the Florida trial court violated his Fourteenth Amendment right to "a meaningful opportunity to present a complete defense" because the exclusion of Galemore's testimony prevented Troy from rebutting arguments made against him. Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). The State attempted to impeach defense witnesses who predicted Troy would do well in prison by questioning their familiarity with the prison system. According to Troy, due

---

[2] The concurring opinion suggests that it is "'unclear' whether AEDPA deference should apply to the Florida Supreme Court's determination that the state trial court properly excluded Mr. Galemore's testimony." As we see it, there is little doubt that we are required by the statutory command of Congress to review the state court's decision through the deferential lens of § 2254(d). Under that law and controlling Supreme Court precedent, it is abundantly clear that a federal habeas writ could issue only if the Florida Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 379. The question we are obliged to answer is whether any fairminded jurist could reach the Florida Supreme Court's decision, not whether we would on de novo review. See Richter, 131 S. Ct. at 786. The concurring opinion has identified no Supreme Court precedent (and we can find none) clearly establishing that the trial court was constitutionally required to admit testimony purporting to predict Troy's future behavior in prison when the witness, by his own admission, knew nothing about the defendant individually, nor which prison he would be assigned to. On this record, a state court reasonably could find that this speculative testimony did not tend to prove or disprove Troy's "disposition to make a well-behaved and peaceful adjustment to life in prison." Skipper v. South Carolina, 476 U.S. 1, 7 (1986); see Tennard v. Dretke, 542 U.S. 274, 284 (2004).

process entitled him to call a corrections official in rebuttal who had some generalized knowledge of prison conditions.  See Gardner v. Florida, 430 U.S. 349, 362 (1977) (plurality opinion) ("[P]etitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.").

Troy's alternative argument fails as well.  Even if the State's cross-examination suggested to the jury that Troy might use drugs while serving life in prison, Galemore could only speculate about possible incarceration outcomes.  The Supreme Court "[has] never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted."  Crane, 476 U.S. at 690.  Supreme Court precedent leaves room for trial courts to exercise a gatekeeping role while permitting the accused to present a complete defense.  Under the Court's clearly established law, due process does not require admission of speculative evidence with only the slightest potential to strike a glancing blow in rebuttal.

Again, Galemore's "potential assessment regarding Troy's possible prison experience" was remote and wholly attenuated.  Troy, 948 So. 2d at 651.  He had no basis to compare the circumstances surrounding Troy's earlier incarcerations, when Troy had obtained and used drugs, with potential future conditions.

21

Galemore could not speak to Troy's past because he knew nothing about Troy or his time in previous prisons and jails. And Galemore could only guess about Troy's future. The Florida Supreme Court had good reason to doubt that the proffered testimony about the overarching "issue of drugs in prison" would have predicted Troy's particular experience. Thus, for example, because he did not know which Florida prison might hold Troy, Galemore could offer nothing about the accessibility of drugs or, indeed, the record of drug use by prisoners in that future facility. Again, the Florida Supreme Court's refusal to grant relief based on the exclusion of Galemore's "entirely speculative" testimony was not contrary to or an unreasonable application of clearly established Supreme Court law. Id.

None of the cases cited by Troy convince us otherwise. In Gardner, the sentencing judge had considered a confidential presentencing report without allowing the defendant to see it. See 430 U.S. at 356. Troy does not allege that any evidence was kept from him. In Simmons v. South Carolina, 512 U.S. 154 (1994), the Supreme Court held that due process protected a petitioner's right to make clear to the jury "that life imprisonment meant life without parole" because information about parole eligibility could rebut the State's arguments about future dangerousness. Id. at 162. Unlike in Simmons, which involved the concrete fact that a life sentence came without the possibility of parole, Troy sought to present speculative evidence of future prison conditions. What's more, the trial court here

22

told the jury that life imprisonment actually meant life. Troy cannot satisfy

§ 2254(d)(1) on his opportunity-to-rebut claim. Again, nothing contained in the

Florida Supreme Court's determination about Troy's Eighth and Fourteenth

Amendment claims amounts to an unreasonable application of clearly established

law.

D.

Even if Troy could clear the § 2254(d) hurdle, he still would not be entitled

to relief because the error would have been harmless when measured against the

habeas "actual prejudice" standard of review -- it would not have "had substantial

and injurious effect or influence in determining the jury's verdict." Brecht, 507

U.S. at 623 (quoting Kotteakos, 328 U.S. at 776); see also, e.g., Mansfield v.

Sec'y, Dep't of Corr., 679 F.3d 1301, 1308 (11th Cir. 2012) ("[A] federal habeas

court may deny relief based solely on a determination that a federal constitutional

error was harmless under the Brecht standard."). "To show prejudice under

Brecht, there must be 'more than a reasonable possibility that the error contributed

to the [conviction or] sentence.'" Mason v. Allen, 605 F.3d 1114, 1123 (11th Cir.

2010) (per curiam) (alteration in original) (quoting Horsley v. Alabama, 45 F.3d

1486, 1493 (11th Cir. 1995)). Considering the powerful aggravating factors

presented at trial, Galemore's testimony would have added precious little to the

extensive mitigation testimony offered by other corrections officers, a psychiatrist,

23

and Troy's family and friends.

The trial court found four potent statutory aggravating factors. First and foremost, the murder of Carroll was "especially heinous, atrocious, or cruel." Fla. Stat. § 921.141(5)(h). The chaotic bedroom where she was found told the story of a brutal, bloody struggle, as did other rooms in the house. Troy stabbed Bonnie Carroll forty-four times: on her neck and throat, her upper chest, on her head and arms, and across her abdomen. In many places, the knife penetrated up to five inches, puncturing her lung, her liver, and her bowels. One knife blade ultimately perforated her thoracic aorta, broke off, and lodged in her lateral right chest. Troy then used another knife, as well as shards of glass. Carroll sustained at least seven blunt traumas to the face and a jagged abrasion in her scalp. Multiple defensive wounds to her hands and arms leave no doubt that Carroll was awake during the onslaught. At one point, Troy had bound her wrists, shoved a folded rag into the back of her throat, and tied a cloth around her neck. Carroll died from multiple sharp force injuries, but she was alive when Troy inflicted almost all of the wounds. Grotesquely, a long, gaping gash in her neck may have extended her life by providing an airway when her throat was gagged. Not without ample reason, the trial court concluded that Troy "made an extraordinary effort to inflict a high degree of pain with utter indifference to Bonnie Carroll's suffering. In the method of injury, the utter ferocity of the assault, and the time required to complete the

24

attack, his actions were manifestly pitiless and unnecessarily torturous."

Second, Troy had been convicted of other felonies involving the use or threat of violence.  Id. § 921.141(5)(b).  In fact, Troy had eight qualifying convictions: three for Armed Robbery, part of a crime spree in the Florida Panhandle; one for Aggravated Assault with a Weapon, when he stabbed a fellow inmate in Tennessee; and, as to Tracie Burchette, Burglary of a Dwelling While Armed with a Dangerous Weapon, Aggravated Battery, Armed Kidnapping, and Robbery with a Deadly Weapon.  Third, Troy had murdered Carroll while on probation for a felony.  Id. § 921.141(5)(a).  At the time of the attack, Troy was both on parole from Tennessee and on conditional release from the Florida Department of Corrections.

Fourth and finally, Troy murdered Carroll during the commission of or attempt to commit robbery and sexual battery.  Id. § 921.141(5)(d).  Troy needed transportation to flee the state and avoid arrest for violating his conditional release. He needed money for the trip and to feed his drug addiction.  By murdering Carroll, Troy got a car and a pitifully small amount of cash.  The jury also heard substantial evidence of sexual assault: Carroll was found nude and gagged, with her clothing cut off and her underwear on the bedroom floor.  She had fresh minor injuries to external genitalia consistent with contact from a penis or fingers.  Her inner thighs had small contusions consistent with fingers attempting to pry open

25

closed legs.  The trial court also found that the murder was committed for pecuniary gain, id. § 921.141(5)(f), though the court noted that this factor merged with the robbery aggravator.

The mitigating factors presented at length to the jury were considerably less significant, even though Troy called twenty-nine witnesses during the four-and-a-half-day penalty phase.  Troy, 948 So. 2d at 651.  Troy's desires to use cocaine and to avoid his impending return to prison contributed to extreme mental or emotional disturbance, particularly because of his drug use at the time.  Id. § 921.141(6)(b).  His capacity to appreciate the criminality of his conduct or to conform his behavior to the requirements of law on the night of the crime was substantially impaired by his use of marijuana, alcohol, and especially cocaine.  Id. § 921.141(6)(f).  The court also found several nonstatutory mitigating factors.  Troy grew up in a dysfunctional family.  He intervened in a violent jail encounter to protect a prison guard who had been a childhood friend.  As a teenager, Troy was sexually molested when he received illegal drugs from a teacher in exchange for sexual favors.  He then suffered stigma in his small town when he testified against the perpetrator.  Troy had a history of mental and emotional problems.  Like he had done after previous crimes, Troy cooperated with police and confessed to Carroll's murder, albeit not at his first chance.  He had difficulty adjusting to life outside of prison, mainly because of his craving for cocaine.  Troy is the father of three

26

children.  He is intelligent, has obtained his G.E.D., and is a prolific letter-writer for himself and others.  He repeatedly expressed remorse for his conduct, though the court found that his statements were rooted in self-pity and not sincere.

Prominently, Troy argued during the penalty phase that he could rehabilitate and contribute substantially if sentenced to life imprisonment.  The jury heard extensive testimony from eight mitigation witnesses who had supervised Troy during previous periods of incarceration.  Corrections officers detailed how Troy had been rewarded with plum job assignments for being a trustworthy inmate.  To guards, he was "quiet" and "respectful."  A Florida prison official who led a construction work crew testified that, out of hundreds, Troy was the best inmate he had ever had: "a hard worker, . . . courteous, respectful."  A female corrections officer testified that John, unlike almost all other inmates, never engaged in lewd behavior toward her.  "He would do anything you asked him to do without disrespecting you in any way."  He worked hard, was not manipulative, and helped de-escalate problems with other inmates.  Yet another corrections officer, from Lincoln County, Tennessee, testified that he could rely on John to protect him from other inmates: "I didn't worry about any problem in the cell block he was in."  A final Florida officer explained how Troy intermediated between guards and prisoners by telling other inmates to follow directions "so we don't have no problems."  A fellow inmate testified that at one facility Troy was the head library

27

clerk, was solely responsible for organizing the prisoners' recreational activities, and was positive and supportive in group therapy sessions for drug addiction.

Family and friends testified that Troy benefited from the rigid structure and guidance of prison. His father explained that Troy "prospered in that environment," where he could help other inmates. "Because of his terrible drug addiction . . . he's best placed in a situation" where he could not get his hands on drugs. His grandfather testified that prison allowed Troy to develop his talents through training as a welder, a roofer, and a mason, and by working with computers. His uncle predicted that Troy could educate other inmates and could warn children about the dangers of drug addiction. According to Troy's penalty-phase mental-health expert, "[i]t's really pretty simple. You put him in a drug free environment for a long enough period of time, and he can become reasonable." The prosecution countered by pointing to Troy's history of drug use while incarcerated. He committed an aggravated assault with a deadly weapon in a Tennessee prison as part of a dispute related to his payment for drugs. Troy also admitted that he tested positive for drugs while on controlled release because he had used marijuana in prison.

Balancing these aggravating and mitigating factors, the jury voted eleven to one to recommend the death penalty. In accepting the jury's recommendation, the trial court "concluded the aggravating circumstances far outweigh the mitigating

28

ones beyond and to the exclusion of any reasonable doubt." Galemore's testimony would have added virtually nothing of value to the jury's calculus. Even on the flawed theory that the evidence shed any light on Troy's possibility for rehabilitation, statements that Troy would serve a life sentence under "close custody," would work while incarcerated, and might find it difficult to obtain drugs in prison could hardly have caused a ripple in the overwhelming wake of aggravating factors. This testimony from yet another corrections officer -- one who knew nothing of Troy's background, character, record, or what prison he would be sent to -- would have paled next to the ghastliness of Carroll's murder. "[I]f one is left in grave doubt, the [sentence] cannot stand." Kotteakos, 328 U.S. at 765; accord Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1114 (11th Cir. 2012). But Troy gives no reason for doubt.

Section 2254(d)(1) bars habeas relief for Troy because the Florida Supreme Court's rejection of his claim was not contrary to or an unreasonable application of clearly established Supreme Court law. Moreover, harmless error would also preclude relief because the exclusion of Galemore's testimony had no "substantial and injurious effect" on the jury's recommendation of death. Brecht, 507 U.S. at 623.

**AFFIRMED.**

29

MARTIN, Circuit Judge, concurring in result only:

I agree with the Majority that Mr. Troy is not entitled to habeas relief because any constitutional error committed at his trial was harmless under the test established in Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710 (1993).  But I do not join in the Majority's ruling that there was no constitutional violation during the penalty phase of Mr. Troy's trial.

We need not decide here whether the Florida Supreme Court's decision is entitled to deference under the Antiterrorism and Effective Death Penalty Act (AEDPA).  That is because "even if AEDPA deference does not apply, [Mr. Troy] cannot show prejudice under de novo review, the more favorable standard of review for [him]."  Berghuis v. Thompkins, 560 U.S. 370, 390, 130 S. Ct. 2250, 2265 (2010).  The Supreme Court allows us to deny "writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review."  Id. (citing 28 U.S.C. § 2254(a)); see also Mansfield v. Sec'y Dep't of Corr., 679 F.3d 1301, 1308 (11th Cir. 2012) ("[A] federal habeas court may deny relief based solely on a determination that a federal constitutional error was harmless under the Brecht standard.").

And for me it is "unclear" whether AEDPA deference should apply to the

Florida Supreme Court's determination that the state trial court properly excluded

Mr. Galemore's testimony.  See Troy v. State, 948 So. 2d 635, 650–51 (Fla. 2006).

In Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954 (1978), the Supreme Court

established the bedrock Eighth Amendment principle that a sentencer in a capital

case must "not be precluded from considering, as a mitigating factor, any aspect of

a defendant's character or record and any of the circumstances of the offense that

the defendant proffers as a basis for a sentence less than death."  Id. at 604, 98 S.

Ct. at 2965.  Of course, the Majority correctly points out that the Supreme Court in

no way intended Lockett to "limit[] the traditional authority of a court to exclude,

as irrelevant, evidence not bearing on the defendant's character, prior record, or the

circumstances of his offense."  Id. at 605 n.12, 98 S. Ct. at 2965 n.12.  But I part

ways with my colleagues' conclusion that Mr. Galemore would have said nothing

constitutionally relevant about "Troy's character, conduct, or individual qualities,

and could only have guessed about Troy's potential conditions of imprisonment."

See Maj. Op. at 3.

It surely means something that when the Supreme Court has "addressed

directly the relevance standard applicable to mitigating evidence in capital cases . .

. [the Court] spoke in the most expansive terms."  Tennard v. Dretke, 542 U.S.

274, 284, 124 S. Ct. 2562, 2570 (2004) (citation omitted).  For example, in

reversing the Fifth Circuit Court of Appeals for applying too narrow a test for

31

mitigation, the Supreme Court explained:

> [T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies. . . . Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.  Thus, a State cannot bar the consideration of . . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.
>
> Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence.

Id. at 284–85, 124 S. Ct. at 2570 (citations and quotation marks omitted); see also Payne v. Tennessee, 501 U.S. 808, 822, 111 S. Ct. 2597, 2606–07 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (quotation marks omitted)).   Under this clearly established Supreme Court law, Mr. Galemore's testimony is relevant mitigating evidence because it "tends logically to prove . . . some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard, 542 U.S. at 284, 124 S. Ct. at 2570.  The specific "fact or circumstance" Mr. Troy sought to prove by way of Mr. Galemore's

32

testimony was Mr. Troy's "disposition to make a well-behaved and peaceful adjustment to life in prison." See Skipper v. South Carolina, 476 U.S. 1, 7, 106 S. Ct. 1669, 1672 (1986).   The Supreme Court has said this type of evidence "is itself an aspect of [a defendant's] character that is by its nature relevant to the sentencing determination." Id.   I am not swayed, as the majority is, by the facts that Mr. Galemore had not interviewed Mr. Troy and could not testify with any certainty about Mr. Troy's designation to a particular prison.  These facts could no doubt offer fertile grounds for cross examination.  But they do not render Mr. Galemore's testimony irrelevant on the topic of whether Mr. Troy "would pose no undue danger to his jailer or fellow prisoners and could lead a useful life behind bars." Id.

Beyond Eighth Amendment mitigation concerns, the excluding Mr. Galemore's testimony also implicates serious due process concerns.  A capital defendant is "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." Gardner v. Florida, 430 U.S. 349, 362, 97 S. Ct. 1197, 1207 (1977).  Mr. Troy and the State both introduced evidence about Mr. Troy's prior drug use in prison, as well as the connection between his drug use and criminal behavior.  This highlights the crucial importance of information about whether Mr. Troy would have access to drugs in close custody condition of confinement, regardless of

33

where Mr. Troy was in prisoned.  Mr. Galemore would have spoken directly to this issue.  I understand that the state trial court did not allow the state to argue that Mr. Troy would have access to drugs if he were sentenced to life, but it did allow the state to impeach defense witnesses on this very issue.

Specifically, during cross examination of defense witnesses, the state raised questions about Mr. Troy's future dangerousness in prison; invited the jury to speculate about his access to drugs while in prison; and highlighted the effect his possible drug use might have on his prospects for adjusting well and not posing a threat to inmates and staff.  Once the state undertook to raise these issues, Mr. Troy was constitutionally entitled to rebut the state's evidence and inferences.  See Kelly v. South Carolina, 534 U.S. 246, 252–57, 122 S. Ct. 726, 731–33 (2002) (holding that a capital defendant is entitled to rebut future dangerousness even it is merely implied by the evidence presented at trial, rather than explicitly argued).

As I mentioned, I have analyzed all of this without the deference ordinarily required by AEDPA.  That is because even under the de novo review I have used, a habeas petition can only be granted if the constitutional violation at the trial level resulted in "actual prejudice" to the petitioner.  Brecht, 507 U.S. at 637, 113 S. Ct. at 1722.  And as the majority has meticulously set out, Mr. Troy was allowed to present what certainly seems to be a mountain of mitigating evidence.  Several of the witnesses the jury did hear, specifically talked about his good prison behavior

34

in the past and his potential to adapt well in the future.  This being the case, and in light of all the other mitigating and aggravating evidence presented, the fact that the jury did not hear Mr. Galemore's testimony did not have a substantial an injurious effect on the outcome of Mr. Troy's trial.  I therefore agree with my colleagues that Mr. Troy is not entitled to habeas relief.